FARMERS' LOAN & TRUST CO. v. PENN PLATE-GLASS CO. et al.

(Circuit Court of Appeals, Third Circuit.    June 14, 1900.)

No. 33.

1. MORTGAGES—INSTRUCTION — OBLIGATION TO PROCURE INSURANCE.

A mortgage given by a corporation to a trustee to secure an issue. of bonds may properly contain provisions defining and limiting the duties and obligations of the trustee to the holders of the bonds, and which have no relation to the contract of the mortgagor, and do not affect its liability.   A clause of such character, relating entirely to the duties and obligations of the trustee, and providing that it shall be no part of its duty "to file or record this indenture,  *  *  *  or to renew such mortgage, or to procure any further, other, or additional instruments of further assurance,  *  *  *  or to effect insurance against fire or other damage on any portion of the mortgaged property, or to renew any policies of insurance, or to keep itself informed or advised as to the payment of any taxes or assessments, or to require such payment to be made; but the trustee may, in its discretion, do any or all of the matters and things in this paragraph set forth, or require the same to be done,"—cannot be construed, in the absence of any other provision on the subject, as imposing on the mortgagor an obligation to keep the property insured for the benefit of the bondholders on demand of the trustee.

2. SAME—PURCHASER OF EQUITY OF REDEMPTION.

Where a mortgage contained no provision requiring the mortgagor to keep the property insured for the benefit of the mortgagee, the fact that the mortgagor did so until it became insolvent does not constitute a construction of the contract by the parties which can bind a subsequent purchaser of the property subject to the mortgage to procure such insurance.

3. SAME—PROCEEDS OF INSURANCE—SUBJECTION TO LIEN OF MORTGAGE.

Where a mortgage did not require the mortgagor to keep the property insured for the benefit of the mortgagee, there is no ground upon which a court of equity can declare a lien in favor of the mortgagee on the proceeds of insurance procured by a purchaser of the property subject to the mortgage.

4. SAME—EQUITABLE · LIEN.

The rule that, where a mortgagor has covenanted to insure the mortgaged property for the benefit of the mortgagee, a court of equity may impress an equitable lien in favor of the mortgagee upon a fund arising from insurance taken by the mortgagor in his own name, is based upon the existence of an express contract by which the owner agreed to give a lien upon that particular fund, and upon the maxim that equity regards as done that which ought to be done; but, as equity cannot create the lien independently of contract, such rule cannot be applied to the proceeds of insurance taken for his own benefit by a grantee of the equity of redemption in the property subject to the mortgage, between whom and the mortgagee there is no contract with respect to such fund.

5. SAME—PURCHASER OF PROPERTY SUBJECT TO MORTGAGE—OBLIGATIONS ASSUMED.

The acceptance of a conveyance of mortgaged property "subject to the mortgage" can have no greater or other effect, at the most, than an express contract on the part of the grantee, with the grantor, to pay the mortgage debt.   It does not bind the grantee to perform any of the covenants of the mortgage, except those which run with the land, and a provision that the mortgagor shall insure for the benefit of the mortgagee is not such a covenant.

6. SAME.

Under the rule in Pennsylvania, by which the contract of a grantee arising from the acceptance of a conveyance of mortgaged property subject to the mortgage is held to be one of indemnity to the grantor with respect to the mortgage debt, the grantee is not bound to indemnify against

a personal covenant of the mortgagor to insure; nor does such conveyance impose any obligation on the grantee which can be enforced by the mortgagee, where the mortgage expressly exempts the mortgagor from personal liability for the mortgage debt.

7. SAME—RIGHTS OF MORTGAGEE—PROCEEDS OF INSURANCE.

The facts that a purchaser of property subject to a mortgage when brought into court as a defendant in a suit to foreclose the mortgage successfully resisted the appointment of a receiver, and in good faith interposed a defense which delayed the rendition of a decree and a sale of the property, and that prior to such decree the buildings on the property were destroyed by fire, cannot give the mortgagee any equitable claim to the proceeds of policies of insurance taken by such defendant for the protection of its own interest in the property.

8. EQUITY—SPECIAL JURISDICTION TO ADMINISTER FUND IN COURT—EFFECT OF STIPULATION.

A stipulation was made in such case by certain large stockholders of the purchasing defendant, which was a corporation, that, in case of the loss of the property by fire pending the litigation, so much of the proceeds of the then existing insurance, taken for the benefit of the defendant, as was necessary to satisfy the mortgage debt, should be set aside for that purpose, provided it should be finally adjudged that the defendant was bound to insure for the benefit of the mortgagee, which it denied. After the destruction of the property, the court, on application of the mortgagee, appointed a receiver to collect the insurance, which he did. *Held*, that such facts did not give the court any special jurisdiction over the proceeds of such insurance, as a fund in court to be administered, nor give the mortgagee any right to a lien thereon which it would not otherwise have had.

Acheson, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

In Equity. The following is the opinion of the court below (BUFFINGTON, District Judge):

As we view it, the decision of the original case depends on the answer to two questions: First, has the trustee shown a right under the mortgage to foreclose? And, secondly, if so, can W. L. Kann or the Penn Plate-Glass Company, later successive purchasers of the mortgaged premises, question the validity of the mortgage? From the very nature of a pledge or mortgage of property, a right to foreclose or sell the pledge arises, ex necessitate, and without express grant of such power, upon default. "Such right of mortgage foreclosure," says Mr. Justice Matthews in Railroad Co. v. Fosdick, 106 U. S. 47, 1 Sup. Ct. 10, 27 L. Ed. 47, "follows from the nature of the security, and arises upon its face, unless restrained by its terms." When, then, the right of a mortgagee or pledgee to dispose of the pledge is denied, a limitation or exception abridging such right should be shown; and such limitation, being in derogation of an inherent, essential right, must be strictly construed. Guaranty Trust & Safe-Deposit Co. v. Green Cove Springs & M. R. Co., 139 U. S. 142, 11 Sup. Ct. 512, 35 L. Ed. 116; Farmers' Loan & Trust Co. v. Northern Pac. R. Co. (C. C.) 61 Fed. 546; Toler v. Railway Co. (C. C.) 67 Fed. 179. Moreover as the provision enabling a mortgagee to take possession of mortgaged premises is held to be cumulative (Morgan's L. & T. Railroad & Steamship Co. v. Texas Cent. Ry. Co., 137 U. S. 171, 11 Sup. Ct. 61, 34 L. Ed. 625; Mercantile Trust Co. v. Missouri, K. & T. Ry. Co. [C. C.] 36 Fed. 221; Farmers' Loan & Trust Co. v. Winona & S. W. R. Co. [C. C.] 59 Fed. 957; Dow v. Railroad Co. [C. C.] 20 Fed. 260; Credit Co. v. Arkansas Cent. R. Co. [C. C.] 15 Fed. 46; Alexander v. Railroad Co., 3 Dill. 487, Fed. Cas. No. 166), it follows that limitation on the exercise of such specific cumulative power cannot restrict the general generic right of foreclosure incident to the mortgage.

The provision in the present mortgage relating to foreclosure by bill in equity is found in the last clause of article third. The clause therein found,

"That, in case default shall be made as aforesaid," refers to the default specified in article second, relating to entry sub conditione by the trustee, and to the default specified in the first part of section third, relating to a public sale sub conditione by the trustee. The first provision relates, inter alia, to a default in payment of interest, and is as follows: "In case default shall be made in the payment of any installment of interest on any of the aforesaid bonds according to the tenor of the said bonds, and of any of the coupons accompanying the same, or in the performance of any covenant, agreement, or stipulation herein contained, and hereby required to be kept and performed by the said party of the first part, and if such default should continue for the period of six months after demand made in writing by said trustee upon said party of the first part for the payment of the said moneys or the performance of the said covenants, it shall be lawful for the said trustee * * * to enter into or upon * * * the premises hereby conveyed." The second provision, found in the opening of section third, embraces the default of interest specified above, and adds the default of principal. It is as follows: "In case default shall be made as aforesaid, or in case default shall be made in payment of the principal of any of the said bonds or any part thereof, and in case such default shall continue for the period of six months after demand made in writing by the said trustee for the payment of the said moneys or the performance of the covenant or covenants, it shall be also lawful for the said trustee, and upon receiving a written requisition, signed by majority in value of the bonds secured hereby, then outstanding, with proper indemnification against costs, compensation, and expenses, it shall be the duty of the said trustee, or its successor or successors, after entry as aforesaid, or other entry, or without entry, personally or by its attorney or agent, to sell and dispose of all and singular the premises, franchises, and contracts hereby conveyed and assigned, or intended so to be, as an entirety, or such part or parts of the same as shall be necessary, from time to time, at public auction." The last clause of section third provides for judicial foreclosure, and is as follows: "And in case default shall be made as aforesaid, and shall continue as aforesaid, it shall also be lawful, and it shall be the duty of the said trustee and its successor or successors in the said trust, upon receiving a written requisition, signed by the holders of one-third in value of the bonds hereby secured and then outstanding, after entry as aforesaid, or other entry, to commence and prosecute such actions, suits, or proceedings at law or in equity as shall be necessary to obtain the sale of the said premises by and under judicial authority, and to bar and foreclose the equity of redemption of the said party of the first part, its successors and assigns, and of all persons claiming under them or any of them and the said premises hereby conveyed or intended so to be, with the appurtenances, and every part and parcel thereof." Analysis of these three provisions shows that the first authorized an entry by the trustee in case interest was defaulted for six months, and retention and operation of the property until such interest was paid from the profits. Action under this provision was wholly at the will of the trustee. The bondholders had no voice or compelling power in its exercise. The second provision was for a public nonjudicial sale by the trustee. To the default of interest specified in the preceding section there was added default in payment of bond principal, and there was superadded a clause empowering a majority in value of the bondholders, on giving indemnity for costs, to compel the trustees to make such nonjudicial sale. The third provision, it will be noted, is for the same defaults, authorizing the entry of judicial procedure by the trustee. It is contended by the respondents that, by this last provision, the trustee could not resort to such judicial proceedings to foreclose unless upon the request of one-third of the bondholders. By the complainants it is contended that the language used was not a limitation upon the right of the trustee to resort to judicial proceedings, but conferred on the bondholders the power to compel the trustees to do that which the default made it lawful and discretionary for it to do without such request. After careful consideration, we are of opinion the contention of the complainant is right. It is the natural construction of the language used, and is in accord with the general scheme of the mortgage. The first provision defines what it shall be lawful for the trustee to do in the way of

simple entry and taking temporary possession. This provision, within the scope of its operation, broadly empowers such trustee to act, but imposes no duty upon him to do so, and empowers the bondholders to impose none. In the broad, untrammeled enabling power thus vested in the trustee, we find the construction and scope of the term "it shall be lawful," as employed in this mortgage. In the second provision, relating to nonjudicial sales, we find the same thought in the words "it shall also be lawful," but find an added duty is cast on the trustee; that is, on request of a majority of the bondholders, the trustee is compelled to sell. That this is the proper construction of this clause there can be no question. Any other reading is a distortion of words. Now, the same general idea is found in the provision for judicial proceedings. The same words, "it shall also be lawful," are found, and serve to indicate untrammeled enabling power vested in the trustee, while introduced by the copulative "and," in conformity with the preceding provision, is the act which the bondholders can compel the trustee to perform. To read the terms, "it shall also be lawful," and, "and it shall be the duty of the trustee," as synonymous, and simply imposing a duty on the trustee at the request of the bondholders, is to deny the first phrase the meaning it unquestionably bears in the two preceding sections. Such construction would vest the trustee with the broadest discretion to make a nonjudicial sale, where he could easily abuse the power, and shear him of all personal discretion in seeking a remedy by a judicial sale, where the court could check any abuse of discretionary power. To warrant such construction, the language should be so explicit that no other was possible. After careful consideration, it is clear to us that the provision in reference to the bondholders was an enabling power, to be exercised at their option, and not a limitation or shearing of the right of the trustee to foreclose. We are there-fore of opinion the trustee had a right to file the present bill without a prior request by one-third of the bondholders.

This brings us to the second question, namely, whether the Penn Plate-Glass Company or W. L. Kann, the subsequent purchasers of the mortgaged premises, can question the validity of the mortgage in suit. It will be noticed that the mortgagor is not contesting the right to foreclose or the validity of the mortgage. The mortgage is assailed by the successive purchasers, to wit, Kann and the Penn Plate-Glass Company. In examining the authorities cited, we must distinguish between those bearing on the question whether a purchaser has personally assumed payment of an existing incumbrance, and those which involve the question whether he takes subject to it. The question now before us is whether the purchasers took the land incontrovertibly subjected to the lien of the prior incumbrance, to wit, the mortgage in suit. This is a mixed question of fact and law. The Pennsylvania Plate-Glass Company having become insolvent, the court of common pleas of Westmoreland county, by virtue of the equity powers conferred by the Pennsylvania statute, took jurisdiction of its assets, and possession thereof by its receiver, and enjoined W. L. Kann, the execution creditor, from proceeding on his execution. The mortgage in suit was not then due or defaulted, the trustee was not made a party to the bill, and, the mortgage being a first lien and duly recorded, the property unquestionably came to said court subjected to the lien of the mortgage. Later the receiver presented a petition to said court to sell the mortgaged property. If the mortgage was ultra vires, was fraudulent, or was given without consideration, it was in the power of the receiver or the corporation, by appropriate remedy, to free the company's land from such unlawful lien. Not only did he omit to do this, but he elected to sell the equity of redemption, and to expressly subject the land, in the hands of the purchaser, to the lien of the mortgage. His purpose to allow the mortgage debt to remain charged on the land, and thus avoid requiring prospective purchasers to pay the entire sum at once, is shown in the petition, which says: "He further suggests to the court that the interest on the $250,-000 of bonds owed by said company will fall due on July 1st next, and that there is no way within his power by which the said interest can be paid, and the bonds prevented from falling due in accordance with the terms of the mortgage. If the real estate and plant of the said company are to be sold; in the opinion of your petitioner such sale should be held some time before July

1st, for the reason that the property can then be sold subject to the lien of the first mortgage, and therefore a very much less sum of money will have to be raised by the purchaser than if the plant were to be sold under foreclosure proceedings by the trustees in the mortgage.    This will result in opening the field to a larger number of bidders, and will probably have the effect of realizing more money from the sale for the benefit of the creditors, and possibly of the stockholders, than could otherwise happen." The order of sale provided: "Property to be sold subject to the lien of the first mortgage of $250,-000, to secure the payment of the bonds, which said mortgage is recorded in Westmoreland county, in Mortgage Book 43, page 1, and subject to all taxes for the year 1894." The return cites the sale made in accordance with the order, and that the property "was sold, subject to the payment of the first mortgage and taxes for 1894, discharged of all other liens, to W. L. Kann, for the sum of $37,000." The sale being confirmed, a receiver's deed was made July 2, 1894, to Kann, which recited: "The above-described property, under the order of court aforesaid, was sold and is now conveyed by the said receiver, and was bought and is now accepted by said grantee, subjected to a mortgage made by the said Pennsylvania Plate-Glass Company to the Farmers' Loan & Trust Company of the City of New York, dated first January, 1891, recorded in Westmoreland county in Mortgage Book No. 43, page 1, and subject, also, to all taxes for the year 1894." It will be noted that the purchaser was the execution creditor, who was enjoined from proceeding on his execution, and who, as a party to the proceedings, must be presumed to have had notice and knowledge thereof.

Acceptance of deed bound the grantee to its conditions. "A grantee, having accepted a conveyance and enjoyed its benefits, is bound by its provisions." Keller v. Ashford, 133 U. S. 620, 10 Sup. Ct. 494, 33 L. Ed. 667. And the language used and the acts of the parties were such as to subject the land to the mortgage burden. So far as the corporation could do, this company by its receiver, and under the supervising control of a court of equity, waived all question as to the validity of the mortgage, and elected to sell the mere equity, subjected to its lien. The title acquired, and the condition on which it was acquired, being part of the same act, the acceptance of the former ipso facto weighted it with the accompanying burden. As to the legal effect of such action on the part of the selling mortgagor and the accepting vendee, we think the vendee accepted and was bound by the status of the mortgage as the mortgagor elected to leave it. The creator of the lien, who had the right to attack it or confirm it, has, prior to the purchaser acquiring any interest whatever in the land, elected to ratify it and sell the land subject to it. If in so doing he has done what he ought not to have done, or left undone what he ought to have done, that concerns the vendor alone. Such act has done the vendee no harm, has caused him no loss. What right, therefore, what equity, what interest, what standing, has the purchaser to question what his vendor has done? What right has he to release the land from the burden to which the vendor has chosen to expressly subject it? What equity or whose equity would be worked out by such a course? The question in hand is not as to the effect of a judicial sale of incumbered property, without any specification of liens in the order of sale, of which Water Co. v. De Kay, 36 N. J. Eq. 552, is an instance, but it is the case of a court exercising its power to sell specifically subject to a lien and a deed made expressly subjecting the property conveyed to a specified recorded lien. In such case the purchaser of mortgaged premises takes but an equity of redemption. He cannot question the validity of the mortgage, else he would acquire an interest in the land never conveyed to him by the vendor. Freeman v. Auld, 44 N. Y. 50; Johnson v. Thompson, 129 Mass. 398; De Wolf v. Johnson, 10 Wheat. 367, 6 L. Ed. 343; Calkins v. Copley, 29 Minn. 471, 13 N. W. 904; Tuite v. Stevens, 98 Mass. 305; Dolman v. Cook, 14 N. J. Eq. 56; Conover v. Hobart, 24 N. J. Eq. 120; Post v. Dart, 8 Paige, 639; Shufelt v. Shufelt, 9 Paige, 137; Green v. Kemp, 13 Mass. 515; Morris v. Floyd, 5 Barb. 130.

The cases from the various state courts disclose convincing reasons in support of the principle. The federal cases are to the same effect. In Bronson v. Railroad Co., 2 Wall. 311, 17 L. Ed. 732, a third mortgage was given by a railroad company, and, in express terms, was made subject to the bonds

secured by a prior second mortgage. On foreclosure proceedings under the third mortgage the road was sold. Subsequently a bill to foreclose was filed by the trustees of the second mortgage, and a company which own'ed the equity of redemption was made a party. An attempt was made to question the validity of the second mortgage. But the right to do so was denied. The court there say: "Even if there had been any valid objection to these bonds under the second mortgage, it was competent for the obligor to waive them; and no better proof could be furnished of the waiver than the acknowledgment of the full indebtedness, by making the subsequent security subject to it. This was a question that belonged to the obligor to determine for himself when giving the third mortgage, but, besides this, what right have those coming in under it to complain? They come in with a full notice of the acknowledgment of the indebtedness and previous lien. And especially what right have the Milwaukee & Minnesota Company to complain, who purchased the equity of redemption through Barnes, their agent, subject to the previous incumbrance of $1,000,000? They have the benefit of that incumbrance, by an abatement of that amount in the price of the purchase." In Jerome v. McCarter, 94 U. S. 736, 24 L. Ed. 137, the same doctrine was announced, the court saying: "Nor is there any doubt entertainable respecting the amount due under the prior mortgages. Indeed, the company is estopped by the provisions of its mortgage, of which the complainant is trustee, from asserting that the entire amount of the two $500,000 mortgages and of the receiver's mortgage was not outstanding when the present mortgage was made. The full indebtedness was acknowledged, by making the junior mortgagee expressly subject to it; and, as there is no evidence that any portion of it has been paid, it is not admissible for the mortgagors or their assignees in bankruptcy to deny it." In American Waterworks Co. v. Farmers' Loan & Trust Co., 20 C. C. A. 133, 73 Fed. 962, the question now before us was considered by the circuit court of appeals of the Eighth circuit. In that case the American Waterworks Company of Illinois, having given two mortgages, sold its plant to the American Waterworks Company of New Jersey, by a deed which described the said mortgages, and recited that the property was conveyed to the grantee company, "subject to said incumbrances." On a bill to foreclose it, the purchaser sought to attack the validity of the mortgages. In holding this could not be done, the court said, "The New Jersey Company, we think, is estopped from asserting the invalidity of the mortgages executed by its predecessor, the Illinois Company, by virtue of the well-established rule that a purchaser of property, who accepts a conveyance thereof which described incumbrances existing thereon, and expressly declares that the conveyance is made subject thereto, will not be allowed to question the validity of such incumbrances. One who thus buys property has no right to challenge the validity of a mortgage lien existing thereon at the date of his purchase, which his grantor by the terms of his conveyance did not see fit to challenge, but recognized in the most formal manner, by declaring that he conveyed the property subject to the existing lien. Whether such mortgage is valid or otherwise is no concern of the purchaser; for, in contemplation of law, he only acquires an equity of redemption in the property conveyed to him,—that is to say, a right to discharge the mortgage debt,—and it would be a breach of good faith, having purchased this right and nothing more, to deny the validity of the incumbrance, and seek to avoid the payment thereof on that ground. As between the grantor and grantee in a conveyance made subject to an existing mortgage, the amount of the incumbrance should be regarded as part of the purchase price left unpaid at the date of the conveyance which the grantee undertakes to pay. At all events, he impliedly agrees not to challenge the validity of the incumbrance. The authorities to this point are amply sufficient, in our opinion, to preclude the New Jersey Company from defending against the foreclosure on the ground that the mortgage is invalid."

In view of these authorities, and of the inherent justice of such a course, we hold that the land having been expressly made subject to the mortgage in suit, and having been purchased and accepted by W. L. Kann, and subsequently by the Penn Plate-Glass Company, subject to the same, neither of said parties can question its validity. No valid reason, therefore, being shown to the con-

trary, a decree of foreclosure will be entered. Of the right of individual bond-holders to participate in the proceeds of said foreclosure we express no present opinion.

### Supplemental Bill.

During the pendency of the original bill the improvements on the mortgaged land were burned. An insurance of some three hundred thousand dollars, placed during the pending of the original bill, was on these buildings. There-after the trustee filed a supplemental bill, making the insurance companies parties, alleging the existence of an equitable lien on said insurance in favor of the bondholders, and praying the appointment of a receiver to collect and hold the proceeds of the policies. Such receiver was thereafter appointed. He has collected the larger part of the insurance, and holds the same subject to the order of this court. It therefore becomes the duty of the court to pass on the question of equitable lien.

There were two parties to this mortgage,—the executing mortgagor and the accepting trustee. Now, the liabilities or obligations created by a contract can rest originally only on a party to it. If they do not rest on some party to the contract, no obligation whatever exists. When, therefore, the Pennsylvania Plate-Glass Company in its mortgage enumerated certain acts which the trus-tee might, in its discretion, require to be done, it is clear that, unless it im-posed the fulfilling of such requisition upon itself, it imposed it upon no one. Indeed, the nature of the acts which the trustee was empowered in its discre-tion to require shows that they were such as the mortgagor would naturally perform. Thus, the trustee could require further instruments of conveyance or assurance. These would be executed by the mortgagor, the owner of the fee. It might require the payment of taxes. These the mortgagor, against whom they were assessed, and who was legally bound for them, would natu-rally be the one to pay. So with the insurance. The owner of the property, the holder of the legal title, the person who had the insurable interest, would be the one to insure. Vesting in another a right to make a requisition im-plies an obligation to honor such requisition when made. We are therefore of opinion that by the terms of the mortgage the mortgagor company covenanted to insure on request of the trustee. The acts of the parties were in accord with such construction. Prior to the receivership the mortgagor company kept the property insured for the benefit of the bondholders, and its obligation so to do was recognized and enforced by the state court during the receiver-ship, by its issue of receiver's certificates for the purpose. These policies were in force when Kann purchased. The proofs show they were turned over to him, and he was informed by the receiver they were outstanding. The cove-nant of the mortgagor to insure on request being shown, demand being made upon it for such insurance, and its failure to comply continued for six months, vesting a right of entry and possession to the trustee, we next inquire, what was the relation to this duty of a successor in the possession and title of the mortgagor to whom such possession was delivered and the equity of redemp-tion conveyed by an order of court, and deed based thereon, in the terms set forth in the foregoing opinion bearing on the original bill?

It has been strongly urged that the covenant to insure does not run with the land, and that this fact governs the case. But this, as we view it, is not the crucial question of this cause. If the insurance made by the purchaser is impressed with an equitable lien in favor of the trustee, it is not because the mortgagor's covenant runs with the land, but because, from the nature and subject-matter of the duty assumed by the mortgagor, the terms of the deed and its acceptance, the facts and circumstances of this particular case, and the law bearing thereon, the insurance placed by the purchaser becomes so liable. To the consideration of such facts and the law thereunto appertain-ing, we now turn.

In an opinion herewith filed, disposing of the original bill, we have recited at length the provisions of the mortgage, the insolvency of the mortgagor company, the receivership proceedings in the court of common pleas of West-moreland county, the sale of the property, together with the proceedings lead-ing thereto, and the deed made in pursuance thereof. The property was pur-chased by W. L. Kann for the sum of $37,000, and conveyed to him by deed

dated July 2, 1894. He held the property until July 1, 1895, when he conveyed the same to the Penn Plate-Glass Company, of which company he was president, for $83,500. His deed recites, "The above-described property is now conveyed by the said parties of the first part, and is now accepted by the said party of the second part, subject to a mortgage made by the said Pennsylvania Plate-Glass Company to the Farmers' Loan & Trust Company of the City of New York for two hundred and fifty thousand ($250,000) dollars, dated Jan. 1, 1891, recorded in Westmoreland county, in Mortgage Book No. 43, page 1; being the same property which Joseph W. Stoner, receiver of the Pennsylvania Plate-Glass Company, conveyed to Wm. L. Kann by deed dated July 2, 1894, and recorded in Westmoreland county, in Deed Book 235, page 257." The interest on the bonded indebtedness falling due on July 1, 1894, and January 1, 1895, was paid by Kann, but that payable July 1, 1895, was defaulted. On November 29, 1895, written demand was made by the trustee upon the mortgagor, its receiver, upon Kann and the Penn Plate-Glass Company, to insure for the benefit of the bondholders. They failed to do so, and such default continued for more than six months prior to the filing of the bill. On the filing of the bill the trustee moved for the appointment of a receiver to take possession. The plant was then being operated by the Penn Plate-Glass Company, a large number of persons employed, the issues of the cause and the legal rights of the parties not determined. In this aspect of the cause, and the court being satisfied that a receiver could not operate the works, it declined to appoint a receiver. The question of insurance arose during the pendency of the application for a receiver; and thereupon counsel for W. L. Kann and the Penn Plate-Glass Company signified their willingness to place insurance upon the property for the benefit of the trustee if they were bound to do so, but denied the liability of said parties to do so. Subsequently they did place a large amount of insurance upon the property, and during the pendency of the motion filed a guaranty, signed by W. L. Kann (the president of the company) and Emanuel Wertheimer (a stockholder), conditioned as follows: "That, in the event of a loss by fire of the property described in the said Pennsylvania Plate-Glass Company mortgage, that then there shall be paid out to the said Farmers' Loan and Trust Company, trustee, in trust for the holders of valid bonds secured by the said mortgage, a sum equal to the total amount of such valid bonds, out of policies of insurance existing in favor of the Penn Plate-Glass Company: provided, that it shall have been finally adjudicated that the Penn Plate-Glass Company, the present owner of the said property, is bound or liable by anything contained in the said mortgage, or the terms of its purchase of the described mortgaged premises, to keep and maintain insurance for the benefit of the holders of bonds secured by the said mortgage. And it is provided, further, that in the event of a loss by fire, and the insurance money payable in that event is applied to the restoration of the plant of the Penn Plate-Glass Company, bound by the said mortgage, that then this obligation shall be null and void, without prejudice to the right of the Penn Plate-Glass Company, its successors and assigns, to deny its liability to take out, keep, and maintain policies of insurance on said plant at any time for the benefit of holders of valid bonds secured for the said mortgage, or for the trustee of said mortgage. And it is further distinctly understood and agreed that, in the event of partial losses and partial restorations, the amount of the insurance money applied thereto shall be a credit on the account for which we have become bound by this obligation." After the loss it appeared that, in the insurance placed, the Penn Plate-Glass Company and W. L. Kann, its president, had placed a provision therein in terms excluding the bondholders from any interest in the policies. Whatever may be the effect of such provision as between the insurance companies and the insured, we do not regard it as a material consideration here. It was an act inter alios acta. The trustee and the court had no knowledge of it. It was not done in pursuance of any agreement, and can in no way affect the legal and equitable status and rights of the parties before the court; for, if the purchaser was bound to insure for the benefit of the trustee, equity will consider the policies as placed in fulfillment of that duty, for it considers that as done which ought to be done. Pom. Eq. Jur. §§ 364–377. It always implies an in-

tention to fulfill an obligation. Id. §§ 420–422. It regards and treats that as done which in good conscience ought to be done. Id. § 364.

The question of the effect of acceptance of a deed reciting that property was conveyed subject to a specified incumbrance is discussed in many Pennsylvania cases. In some it was held a personal liability, or an assumption of the incumbrance direct to the original creditor, was created; in others, that no such direct liability to the original creditor arose, but an agreement by the vendor with his vendee to indemnify the latter against having to pay the incumbrance. To warrant a decree for an equitable lien in this case, it is sufficient to hold that, as regards the covenant to insure, there was an agreement to indemnify, though, from the nature of the subject-matter, and the special facts and circumstances, there are grave reasons for contending that the purchaser of the property in this case became directly liable to the trustee to insure. The covenant of the mortgagor in reference to insurance was sui generis. It was not a covenant which necessarily bound the mortgagor to the performance of any present or future thing. It obligated insurance, it is true, but only in case it was required by the trustee. The trustee might never exercise its right. Hence, while the possible liability existed, there was no certainty it would ever attach. From these considerations, it is clear that when the mortgagor came to sell the property there was no exact financial value which could be put upon this covenant to insure. It could not be a subject of barter and sale, because liability under it depended wholly and solely on the will of the trustee. It was created by the mortgage, but was a matter to be performed in futuro, but at once if required. Now, with this unfulfilled, future, and indefinite liability clearly resting by the mortgage on the mortgagor at the time of the sale, what, as between the vendor and vendee, became of it when the property was sold, and the vendee, by the terms of the deed, left the purchase money, to the extent of the mortgage debt, in the land, and agreed to indemnify the vendor against it? The duty to insure was incidental and supplemental to the mortgage debt. Its purpose was to make it more secure and insure the payment. As was said by the supreme court of that state in Miller v. Aldrich, 31 Mich. 418, when speaking of the relation of a covenant to insure to the mortgage: "Chapman had bound himself to afford Miller security supplementary to and connected with the mortgage. The mode agreed on had reference to the mortgage buildings, and was to be of a nature to keep the mortgaged property itself so far intact, as a means of security to perpetuate the safety of the mortgagee's interest in case the buildings should burn. This stipulation was in equity a sort of adjunct to the mortgage, and was binding on Chapman, and on all others in his shoes with notice." Now, if by acceptance of the deed the purchaser agreed to indemnify the vendor against the mortgage debt, shall he not much more be deemed to have assumed every incident which was made a supplemental, additional, covenantal means of insuring the payment of such mortgage debt? By the authorities already cited, it is clear that by the terms of the deed this property was subjected incontrovertibly to the burden of this mortgage. It did not lie in the purchaser's mouth to question or release the land from the burden to which he and his vendor had subjected. So much for the rights of the trustee. As between the vendee and the vendor, the authorities are clear that by the terms of the deed the vendee agreed to indemnify the vendor against liability on the mortgage. Conceding for present purposes that, on a sale under the mortgage of the premises, personal liability of the mortgagor for the bonded debt ceased, yet, in the first place, no sale has thus far taken place; and, in the second, the company is still liable for the mortgage debt by virtue of its covenant to insure, and hence the need of indemnity against such covenant to insure. Was this liability indemnified by the vendee's acceptance of the deed? In Campbell v. Shrum, 3 Watts, 60, the leading Pennsylvania authority, it was held that acceptance of an agreement to convey land "under and subject to the payment of all the purchase money and interest now due," by a specified article of agreement, constituted an assumption by the vendee. In Blank v. German, 5 Watts & S. 42, the principles of an "under and subject" purchase are discussed, and it is there said: "Had the defendants below purchased the property subject to the mortgage debt, the case would have been within the principle of Campbell v. Shrum, because the price would have been estimated

at the clear value less the mortgage debt; and it may be said that so much of the price would have been virtually retained to answer it, so that the plaintiff would have answered that much, had he been compelled to pay with other funds than those set apart for the purpose in the defendant's hands. As it would have been a fraud in them to retain his money and let him be pursued for it on his bond they would have been held liable on an implied promise to apply it to the purchase intended; and it may be said in every such case that he who purchases expressly subject to an incumbrance, as between the vendor and himself, makes the debt his own, which is the principle of Campbell v. Shrum." In Woodward's Appeal, 38 Pa. St. 327, the words of the deed were, "subject to the payment of $2,000,—the mortgage debt." It was there said: "It cannot be doubted that accepting a deed from Mr. Spackman for the house and lot, expressly subject to the mortgage, was an assumption by the vendee to pay it. The debt secured by the mortgage was that of the vendor, and, if its payment was not assumed by the vendee, the express subjection of the property to it by the deed amounts to nothing. The ultimate liability is still upon the vendor, and not upon the house, and the vendee has acquired the entire ownership, without paying or being liable to pay any more than the sum of $8,750." In Moore's Appeal, 88 Pa. St. 452, prior cases were examined by Judge Sharswood, and summed up as follows: "An examination of the cases which have been decided on the legal effect of such a clause in a convey·ance shows, we think, that, unless there exist special circumstances to raise a covenant to pay the incumbrance, it amounts only to an indemnity to the ven·dor. In the language of the opinions, 'the vendee makes the debt his own, as between him and the vendor, for his protection.'"

The question is not affected by the Pennsylvania act of June 12, 1878 (P. L. 205), which provides that the grantee of real estate bound by mortgage, etc., shall not be personally liable therefor, except on an express assumption, and that the use of the words "under and subject to the payment of such ground rent, mortgage, or other incumbrance," shall not, alone, be construed as to make such grantee personally liable as aforesaid. Prior to the passage of this act, as we have seen, it was held in some cases that the under and sub·ject clause constituted a direct assumption of the debt to the holder of it; in others, that it created a mere agreement, as between vendor and vendee, to indemnify the vendor against the incumbrance. The act was then passed, which, as we read it, provided that the under and subject clause alone should not be construed to create a personal liability for the debt (that is, a direct assumption to the owner), but left unaffected the implied covenant to indem·nify, as between vendor and vendee. In other words, while the purchaser subject to such incumbrance did not assume payment of the debt to the holder, he was still bound to indemnify his vendee against the incumbrance. In Blood v. Crew-Levick Co., 171 Pa. St. 333, 33 Atl. 316, the deed of the free·hold portion, made after the passage of the act, recited it was "under and sub·ject to the lien" of a mortgage, and contained the further provision, "It is hereby agreed between the parties to this instrument that the said party of the second part accept the title * * * subject to the payment of the mortgages herein mentioned." Of these provisions the court say: "We have, then, an implied covenant to indemnify, arising from the 'under and subject to the lien of' clause, and an express covenant in the stipulation, beginning with the words, 'It is hereby agreed' to pay the mortgage debt to the holder of the mortgage."

After careful consideration of the law applied to this case, we are of opinion that Kann and the Penn Plate-Glass Company, the subsequent purchasers of the equity of redemption, undertook to indemnify the mortgagor against liability on its covenant in the mortgage to insure. The proofs show that request to insure was duly made by the trustee upon the mortgagor and upon the subse·quent purchasers, which request was not complied with. It would therefore seem that by such failure to insure there was a default, and a direct liability of the mortgagor to the trustee upon the covenant to insure; and there was a default, and a liability of the subsequent purchasers to the mortgagor upon their agreements to indemnify. Such requests were made in writing more than six months prior to the filing of the bill. Default having continued more than six months, it became such a breach as warranted the trustee in either

taking possession, selling at nonjudicial sale, or maintaining foreclosure proceedings. After the bill was filed a demand upon these parties to insure was also made at bar by counsel for the trustee at the time of the application for a receiver to take possession of the mortgaged premises, as we have noted above. Under the facts it would seem that a court of equity, having jurisdiction of the subject-matter and of all parties, had power to, and, to avoid circuity of action, would, direct the purchaser to insure for the benefit of the trustee. This court had jurisdiction of the mortgage, and therefore of the mortgagor and mortgagee. Kann and the Penn Plate-Glass Company, who had bought subject to it, were also parties. The question of insurance, with the determination of the several rights or obligations of all parties in reference thereto, were kindred and germane to the foreclosure, and therefore to the principal subject of jurisdiction. The principle is clear that, where equity jurisdiction has once rightfully attached to a controversy, it will be made effective for the purpose of complete relief, and to dispose of all incidental and germane questions. Fetter, Eq. p. 13; Winton's Appeal, 97 Pa. St. 395; Allison's Appeal, 77 Pa. St. 227; McGowin v. Remington, 12 Pa. St. 63; Souder's Appeal, 57 Pa. St. 498; Socher's Appeal, 104 Pa. St. 615. The trustee having exercised its right of requiring insurance, the mortgagor being insolvent, the purchaser being in possession and enjoyment of the premises, and all parties before the court, it would seem clear to us that a court of equity, by its very nature constituted with plastic power to secure direct results, and in pursuance of its principle of avoiding circuity of action, had the right to order and decree that the purchaser should place insurance upon the property for the benefit of the trustee. A court of equity having original jurisdiction to compel specific performance of a contract to indemnify (Chamberlain v. Blue, 6 Blackf. 490; Champion v. Brown, 6 Johns. Ch. 398; Fry, Spec. Perf. [3d Am. Ed.] p. 704), its jurisdiction and power to do so in this case, where the covenant to insure was incidental to the mortgage, the original subject of jurisdiction, and where, moreover, the breach of such covenant to insure was one of the grounds warranting the foreclosure, would seem clear. That the court did not see fit, in an interlocutory stage of the case, to make such order; that in such preliminary stage it did not enter into an immediate, definite ascertainment of its right or duty to do so,—cannot affect the relative right of the parties. Mere lapse of time will not prevent a court of equity from affording relief, where there was a right to relief when the bill was filed. Wilkinson v. Torkington, 2 Younge & C. Exch. 729.

Pending the appointment of a receiver, the purchasers agreed to and did place insurance, and the improved property has been wholly destroyed. If the insurance goes to the bondholders, it represents an avoidance of loss for that which it held as security for money paid to the mortgagor. If the purchaser holds it, it speculatively gains by the destruction of that for which it had never paid, to wit, the $250,000, representing deferred purchase money. Now, on final hearing of this case, it being clear that the purchaser was liable at any time during its pendency to the entry of an order directing that insurance be entered for the benefit of the trustee, and the purchaser having in effect placed insurance subject to the determination of the court as to its liability to do so, why should not the court on final hearing enter the decree which it could have made in an earlier stage of the case? This insurance was placed by a party to this litigation under stress of an application for the appointment of a receiver, and a consequent exclusion from possession. It is now clear that such litigant should have placed the insurance for the benefit of the trustee, and was bound to do so if thereto required by the court. When now, on final hearing, the proceeds of that insurance are before the court,—when the position of the parties has not been changed,—why should not this court on final decree stamp with an equitable lien the proceeds of a fund which it might have created by an earlier order? The position of the parties has not changed. To say that the trustee had an insurable interest, and could itself have insured, does not affect the case. While it could do so, it could also require the mortgagor to perform this duty. The purchasers, with full knowledge of that duty on the part of the mortgagee, took the property, and undertook to indemnify the vendor against this covenant. This they have not done. They paid some $83,000 for the property. They insured it for more than

$300,000. and now, on the destruction of the property, which was the substantial security for $250.000 owing the trustee, they seek to avoid payment of the $250,000, and to realize on the $83,000 paid by them the sum of upwards of $300,000 in insurance upon property for which they have never paid. The allowance of such a result, under the facts and circumstances, would be highly inequitable; for it is a principle of equity that in a contest between one who, seeking to make a gain, and one who is struggling to avoid a loss, equity will lean toward him who has actually lost, rather than to him who merely seeks to gain. Miller v. Aldrich, 31 Mich. 416. After careful consideration, therefore, we are of opinion that, to the extent of all valid outstanding bonds represented by the trustee, this fund is in equity and good morals stamped with an equitable lien, and that it is the duty and right of this court to enforce it.

Bernard Carter, for appellants.
Herbert B. Turner and John G. Johnson, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is an appeal taken by the defendant the Penn Plate-Glass Company from a decree rendered by the circuit court of the United States for the Western district of Pennsylvania in favor of the complainant, the Farmers' Loan & Trust Company, as trustee, against the defendants. On January 1, 1891, the Pennsylvania Plate-Glass Company, a Pennsylvania corporation, made a mortgage to the Farmers' Loan & Trust Company, a New York corporation, to foreclose which mortgage the original bill herein was filed. The mortgage covered the plant of the mortgagor company,—being a specified tract of land in Irwin, Westmoreland county, Pa., with certain gas and water contracts,—and all the company's other property, real or personal, then owned or thereafter to be acquired, including rents, issues, and profits. This mortgage was given in trust to secure 6 per cent. bonds which were issued to the amount of $250,000 of principal. On the 19th of March, 1894, a suit was brought in the court of common pleas of Westmoreland county, at the instance of the directors, against the Pennsylvania Plate-Glass Company, to procure its judicial dissolution. In that suit Joseph W. Stoner was on that day appointed receiver of the company. An order was subsequently made for the sale of the property by the receiver, subject to the lien of the existing mortgage of $250,000. Accordingly, on the 18th of June, 1894, the receiver sold the property so subject to the mortgage at public auction. The defendant W. L. Kann was the purchaser, the price being $37,500. On July 2, 1894, a deed was, by order of the court, given by the receiver to Kann. It, in accordance with the terms of the order, recited that the conveyance was made "subjected to a mortgage made by the said Pennsylvania Plate-Glass Company to the Farmers' Loan and Trust Company of the City of New York for two hundred and fifty thousand dollars ($250,000), dated Jan. 1st, 1891, recorded in Westmoreland county in Mortgage Book 43, page 1." Kann held this property for about one year, and until July 1, 1895, when, by deed of that date, he sold and conveyed it to the Penn Plate-Glass Company, one of the defendants herein,—a corporation probably organized by Kann himself for the manufacture of plate glass,—for $83,000. It is claimed by Mr. Kann and the appellant company that, in addition to the consideration named in the deed, expenditures

for improvements placed upon the property amounted to $200,000, and brought the purchase price to the Penn Plate-Glass Company up to about $300,000. These figures are disputed by the complainant, but there is no testimony that directly contradicts that of Mr. Kann in this regard. The deed from Kann recited that the property was conveyed "subject to a certain mortgage made by the Pennsylvania Plate-Glass Company to the Farmers' Loan & Trust Company, of New York, for $250,000, dated January 1st, 1891, and recorded in Westmoreland county, in Mortgage Book 43, page 1"; this being the mortgage in question. While Mr. Kann held the title to the property he paid the interest coupons on the bonds maturing during his ownership; but those maturing July 1, 1895, the time of the purchase by the Penn Plate-Glass Company, were not paid by that company, and no coupons have been paid since. The Farmers' Loan & Trust Company, in pursuance of the provisions of the mortgage, then declared the principal of the mortgage due, and on July 8, 1896, filed the original bill in this case to foreclose the mortgage, against the Pennsylvania Plate-Glass Company (the mortgagor), W. L. Kann, and the Penn Plate-Glass Company. Kann and the Penn Plate-Glass Company put in answers contesting the right to foreclose on the ground that the mortgage itself was invalid, except as to such of the bonds thereby secured as were held by purchasers for value without notice, and averring that the requisite number of bondholders had not requested such action, and that such request was a condition precedent under the provisions of the mortgage. The Pennsylvania Plate-Glass Company, the mortgagor, put in no answer, and its receiver, Stoner, was not made a party to the bill.

About the time of filing this original bill, namely, on July 16, 1896, the plaintiff made a motion for the appointment of a receiver of the mortgaged premises. This was refused, but, after the court had announced its decision, counsel for complainant mentioned the fact that there was no insurance on the property for the benefit of the bondholders, and that they would be unprotected in case of a loss by fire. Thereupon counsel for defendants expressly denied that either the Penn Company or Kann was bound to insure for the benefit of bondholders, either by virtue of anything contained in the mortgage or the terms of their purchase. Counsel for complainant insisted that they should have insurance, whereupon the court below said, "I can't decide that question," and intimated to defendants that, if they were bound to insure, they ought to protect complainants. They denied still that they were bound to insure, but W. L. Kann and Emanuel Wertheimer, who were stockholders in the Penn Company, agreed to give their individual bond or agreement that out of the then existing policies of insurance, which had been previously taken out by the Penn Company, there should be paid out to the Farmers' Loan & Trust Company, in trust for the holders of valid bonds secured by the said mortgage, a sum equal to the total amount of such lot of bonds. This stipulation was entered into, and approved by the court, and filed, and contained this proviso:

"Provided, that it shall have been finally adjudicated that the Penn Plate-Glass Company, the present owner of the said property, is bound or liable

by anything contained in the said mortgage, or the terms of its purchase of the described mortgaged premises, to keep and maintain insurance for the benefit of the holders of bonds secured by the said mortgage."

The insurance referred to in the above instrument had been placed a long time prior to both the filing of the original bill and the application for a receiver. When Kann became the purchaser of the property at judicial sale, in 1894, he made contracts of insurance to the amount of about $450,000, covering only his interest in the mortgaged property, and expressly excluding the interest of the bondholders by the following clause in all the policies, namely:

"This property is subject to a mortgage of $250,000, but it is distinctly understood that this insurance does not cover the interest of the bondholders."

When the Penn Plate-Glass Company, a year later, purchased the property, the insurances were perfected with the same clause excluding the interest of the bondholders.

At or about the time Kann purchased and insured the property as aforesaid, the Farmers' Loan & Trust Company notified Kann to insure for the benefit of the bondholders, in reply to which Kann notified that company in writing that he refused to so insure, and that the existing and future insurance was and would be for his own benefit, and not for the benefit of the bondholders. Similar demands were made upon the Penn Plate-Glass Company at the time of its purchase, and similar replies made by it thereto. These demands and refusals occurred about two years prior to the filing of the original bill, in July, 1896, and have continued and been persisted in ever since, and were reiterated at the time of the application for a receiver under the mortgage foreclosure suit. No further action was taken by the trustee, either to insure itself or to procure its bondholders to do so, or to compel the Penn Company or Kann to do so; and matters in this respect remained in statu quo for nearly three years, when, on April 12, 1898, and before the determination by the court of the issues raised by the original bill, a large part of the plant of the Penn Company was destroyed by fire. Thereupon the Farmers' Loan & Trust Company filed its supplemental bill, claiming an equitable lien on the insurance money held by the Penn Plate-Glass Company to the extent of its loss, and asking that the insurance companies be restrained from paying the insurance moneys to the Penn Company, but that they pay the same to the Farmers' Loan & Trust Company, as trustee for the bondholders, basing its equitable right to relief on the following grounds, namely: (a) That the clause in the mortgage relating to insurance constituted a covenant on the part of the mortgagor company, the Pennsylvania Plate-Glass Company, to insure for the benefit of bondholders. The clause referred to contains the only provision in the mortgage relating to insurance. (b) That in pursuance of this provision the mortgagor company, the Pennsylvania Plate-Glass Company, did place insurance for the benefit of the bondholders, and did maintain the same up to the time of its insolvency, and the appointment of Stoner as receiver. (c) That the receiver, under the directions of the court of Westmoreland county, maintained this insurance until the property was knocked down to Kann at receiver's sale. (d) That Kann, upon his acquisition of the mortgaged property, with full knowl-

103 F.—10

edge of the covenant to insure and of the foregoing facts, allowed this insurance to lapse, and, in spite of repeated demands by the trustee, refused to insure for the benefit of the bondholders, and has since persisted in this refusal. (e) That Kann had identified himself with the mortgagor company, advanced money to it, knowing it to be insolvent, and by his acts in connection therewith had brought about the receivership and wrecked the company, and that he had bought the property for $37,500. (f) That the said Kann, having thus purchased the property subject to the mortgage, was, under the foregoing circumstances, bound to insure for the benefit of the bondholders. (g) The bill further alleged that the Penn Plate-Glass Company was also bound to insure, and stood in the shoes of Kann, because: (1) It had been organized by Kann for the express purpose of purchasing from Kann the mortgaged property and operating the same; and because Kann was the president and principal stockholder therein, and therefore was affected with notice of all the foregoing facts and circumstances concerning the previous insurance, as well as of the covenant to insure. (2) That the trustee, upon the purchase by the Penn Company, notified it in writing upon December 1, 1895, to insure for the benefit of the bondholders, but in response thereto that company had notified the trustee in writing of its refusal so to do, and had persisted in this refusal ever since, although repeated demands had been made upon it to this effect. The above demand was first made nearly a year before the filing of the original bill. (3) That the Penn Plate-Glass Company had interposed a frivolous defense to the original bill, and delayed the proceedings thereunder, thereby preventing the foreclosure and sale, which would otherwise have taken place before the occurrence of the fire. (4) That the Penn Company, with the full knowledge of the foregoing circumstances, had accepted a deed of the property, subject to the mortgage, and was therefore bound to insure for the benefit of the bondholders.

Upon the filing of the supplemental bill, to which about 95 insurance companies were made parties, the court below made an interlocutory decree, appointing Emanuel Wertheimer receiver, to collect the insurance money arising from the existing policies, and to hold $125,000 thereof for the benefit of 90 bonds secured by the mortgage (the remaining 160 bonds being owned by Wertheimer, who stipulated that the same should not participate in the insurance money), in case it should be decided that the trustee of the bondholders had an equitable lien on such insurance money. The receiver was further directed to pay over all moneys over and above the $125,000 to the Penn Plate-Glass Company. On February 24, 1898, the court below handed down an opinion overruling the defenses to the foreclosure of the mortgage, and finding that the trustee thereof was entitled to an equitable lien on the insurance money previously placed by the Penn Plate-Glass Company, and on the 25th of July, 1899, entered a final decree, which, inter alia, fixed the amount due on the mortgaged property, ordered the foreclosure thereof and a sale of the mortgaged premises, and found that the value thereof was not sufficient to pay the mortgage debt, and ordered the receiver to pay over so much of the $125,000 of insurance moneys held by him as should be necessary to pay

in full the 90 bonds entitled to participate therein, after crediting them with their pro rata share of the proceeds of the sale of the mortgaged premises. It is from so much of the decree as awards an equitable lien on the insurance money to the complainant that this appeal is taken, and the appellant has filed in this court 29 assignments of error. In the view that will be taken by the court, it is not necessary to consider these assignments separately, as they may all be disposed of in the consideration of three questions which underlie them. These questions are: First. Was there, under the terms of the mortgage, an obligation upon the mortgagor, arising from express covenant or otherwise, to insure and keep insured the mortgaged premises for the benefit of the mortgagee? Second. If the preceding question is answered in the affirmative, then, whether the Penn Plate-Glass Company, by becoming the grantee of the equity of redemption, subject to the mortgage, thereby came under an obligation to insure for the benefit of the trustee, or such an obligation to indemnify the mortgagor against its liability to insure (if such liability existed) as would be available to the mortgagee and complainant in this suit. Third. Even if the preceding question, in both its branches, be answered in the negative, whether there was any equitable obligation resting on the defendants to insure for the benefit of the trustee, growing out of their dealings with this property, or growing out of any alleged exceptional facts or circumstances of the case; in other words, whether, as disclosed in this record, such a special state of facts and circumstances exists as would make it incumbent upon a court of equity to infer a right in the mortgagee to a lien on the insurance, or to impress the fund collected by the receiver from the insurance companies with such a lien in favor of the mortgagee and bondholders.

The first question, of course, stands at the very threshold of this case, and, unless it can be answered affirmatively, there is no foundation upon which can be erected the equitable obligation on the part of the defendants, one or both, or the equitable lien upon the insurance fund paid by the insurance companies to the receiver, as contended for by the complainant below. This is conceded by counsel for complainant below, but they refer us to the tenth article of the mortgage, as containing such express covenant or stipulation on the part of the mortgagor to insure the mortgaged premises for the benefit of the mortgagee and bondholders. No other part of the mortgage is relied on for this purpose, and here, or not at all, must be found the express agreement to insure, from which, and from which alone, the important duties and equitable obligations claimed as against these defendants or these funds must spring. The second and third paragraphs of the tenth article of the mortgage, in which the language referred to occurs, are as follows:

"The trustee shall be under no obligation to recognize any person as holder or owner of any bonds secured hereby, or to do or refrain from doing any act pursuant to the request or demand of any person, until such supposed holder or owner shall produce said bonds and deposit the same with the trustee.

"It shall be no part of the duty of the party of the second part to file or record this indenture as a mortgage or conveyance of real estate, or as a chattel mortgage, or to renew such mortgage, or to procure any further, other,

or additional instrument of further assurance, or to do any other act which may be suitable and proper to be done for the continuance of the lien thereof, or for giving notice of the existence of such lien, or for extending or supplementing the same; nor shall it be any part of its duty to effect insurance against fire or other damage on any portion of the mortgaged property, or to renew any policies of insurance, or to keep itself informed or advised as to the payment of any taxes or assessments, or to require such payment to be made; but the trustee may, in its discretion, do any or all of the matters and things in this paragraph set forth, or require the same to be done. It shall only be responsible for reasonable diligence in the performance of the trust, and shall not be answerable in any case for the act or default of any agent, attorney, or employé selected with reasonable discretion. It shall be entitled to be reimbursed all proper outlays of every sort or nature by it incurred in the discharge of its trust, and to receive a reasonable and proper compensation for any services that it may at any time perform in the discharge of the same."

It requires attentive reading to discover the language in these paragraphs which would give color to the contention of complainant below as to the existence of a covenant therein on the part of the mortgagor to insure for the benefit of the mortgagee and bondholders. It is upon the words "or require the same to be done," in the last paragraph quoted, the complainant below relies. These words, in connection with what preceded them, it is contended, embody a covenant or stipulation on the part of the mortgagor to insure the mortgaged premises for the benefit of the mortgagee and bondholders, whenever demanded by the mortgagee. These paragraphs from the tenth article of the mortgage are obviously concerned with limitations on the responsibilities and obligations of the mortgagee and trustee to the bondholders. Other articles in the mortgage are concerned with prescribing, as between the mortgagor and mortgagee, the terms or conditions upon which default or forfeiture of the mortgage may be declared by the mortgagee, and with exempting the mortgagor from personal liability for the debt the mortgage was given to secure, and confining the remedy of the mortgagee to recover the same to proceedings under the mortgage. Articles containing these stipulations obviously relate to contractual relations between mortgagor and mortgagee. But, in the paragraphs quoted, after the operative and conveying and defaulting clauses in the mortgage, which have to do with the relations of mortgagor and mortgagee, we have here, in the tenth article, what naturally belongs to such an instrument, viz. a declaration and qualification of the trusts assumed in said mortgage by the mortgagee, as trustee, to the bondholders. The language employed is not contractual, as between mortgagor and mortgagee, but declaratory of the trusts assumed, and is addressed by the trustee to his cestuis que trustent. The mortgagor could have no interest in the duties or responsibilities assumed by the trustee to the cestuis que trustent, and the limitations and qualifications put upon those duties and responsibilities so assumed could not affect in any degree the liability of the mortgagor. It seems to us that the court below was in error in deciding that there was such a covenant or contract between the mortgagor and mortgagee. In support of its conclusion the court reasons as follows:

"There were two parties to this mortgage,—the executing mortgagor and the accepting trustee. Now, the liabilities or obligations created by a contract can rest originally only on a party to it. If they do not rest on some

party to the contract, no obligation whatever exists. When, therefore, the Pennsylvania Plate-Glass Company in its mortgage enumerated certain acts which the trustee might, in its discretion, require to be done, it is clear that, unless it imposed the fulfilling of such requisition upon itself, it imposed it upon no one."

We think the court below was mistaken in this reasoning. It is quite possible that language could be used by one of the parties to the mortgage—the mortgagee and trustee in this case—which did not at all refer to the contract between mortgagor and mortgagee, and which did not go to create "liabilities or obligations" as between the parties to the mortgage; and especially is this so when we consider that, while the mortgagee in this case bears a contractual relation to the mortgagor, he also bears a fiduciary relation, as trustee, to his cestuis que trustent, in some respects quite independent of his relation as mortgagee to the mortgagor, and that it was quite natural and in accordance with usage in such matters that the trustee should attempt to state in the mortgage, with precision, the extent of the trust which he had assumed for the bondholders. To do this, it was not necessary that he should contract with the mortgagor, or that the language employed by him for the purpose should import obligation to or by the mortgagor. But complainant below contends that the natural import of the word "require" is to impose obligation on some one, who in this case could be no one else than the mortgagor. Let us see if this is so. If the language referred to can have no other interpretation, and if, as the court below says, it "necessarily" refers to an obligation imposed on the mortgagor, then, however unsatisfactory it might be to construe language so vague and indirect into a positive covenant of such value and importance as it is here claimed to be, we would feel compelled to so construe it. But is such a construction a necessary or even a plausible one? It is, in the first place, to be noticed that the alternative phrase, "or require the same to be done," does not specially refer to the subject of insurance, and is not found in direct connection with the language exempting the trustee from responsibility in that regard. It occurs at the close of an enumeration of a number of things which the trustee declares it shall not be under obligation to its cestuis que trustent to do. So that it is not the case of the trustee speaking specifically about its exemption from obligation to insure, and saying, as to that, it may, in its discretion, insure or require the same to be done, but it is a case where the trustee, having exempted itself from liability in a number of matters, reserves to itself, in a general phrase, the right, if it sees fit, to do any of the enumerated things. In applying this phrase to the preceding enumeration of things, as to which the trustee claims exemption, we find there are certain acts which refer to an individual performance on its part; as, for example, it is not obliged to "file or record the mortgage," or "renew such mortgage," or "procure further assurance," or "do any act suitable for the continuance of the lien," or "give notice of the existence of the lien," or "effect insurance against fire," or "renew policies of insurance." These are all things to be done or not to be done by itself. Then we have the following: It is not obliged to "keep

itself informed or advised as to the payment of any taxes or assessments, or to require such payment to be made." Here is a matter as to which there is a distinction made between the direct, personal act of the trustee itself, and what it may require another to do; and the language immediately following would seem to have been framed with direct reference to that distinction, so that when the trustee says it "may, in its discretion, do any or all of the matters or things in this paragraph set forth, or require the same to be done," it was to make it applicable, among other things, to the language just referred to, in regard to the payment of taxes. The alternative phrase, "or require the same to be done," makes the whole reservation of authority to the trustee cover more completely (verbally at least) the preceding enumeration of acts and things as to which it had exempted itself from liability. Again, it is not without significance that although among the enumerated exemptions from duty claimed by the trustee, in this tenth article, there is one from the duty of procuring "further assurance," yet we find that there is an express and formal covenant for further assurance, constituting article 6 of the mortgage. It is from this apparent that the parties to the mortgage, and their counsel, when they desired to bind the mortgagor, knew how to draft a covenant for that purpose, and that they did not consider the mere allusion to an exemption of the trustee, in the tenth article, in connection with the clause saving the right of the trustee to do the thing from which it was exempted, or require the same to be done, a covenant on the part of the mortgagor. It is also clear that this procuring further assurance having been made the subject of a distinct obligation on the part of the mortgagor, by the covenant in the sixth article, was one of the enumerated acts as to which the alternative clause, "or require the same to be done," might apply. It is true that it appears from the record that the mortgagor company did, after the execution of the mortgage, and until the time it went into the hands of a receiver, take out and maintain a partial insurance for the benefit of the mortgagee, and that the receiver, under the direction of the court of Westmoreland county, Pa., maintained this insurance till the property was sold by him to Kann. There is some force in the argument that this was an interpretation of the meaning of the language in the tenth article. But this action of the mortgagor and the receiver cannot amount to the creation of an obligation which was not expressed in the mortgage, and which would bind a subsequent purchaser, whose obligation extended only to the actual meaning of the terms of the mortgage, not to any construction which the original mortgagor might give them. Besides, the mere taking out of insurance by the mortgagor may well have occurred with an understood absence of contractual obligation, and have been prompted by general notions of propriety or feelings of benevolence and good will. If, then, there is no original obligation imposed by the mortgage on the mortgagor to insure for the benefit of the mortgagee, there is no foundation on which the argument for a derivative obligation in that regard can rest; and, as there is no express contract of the grantee of the equity of redemption to so insure, there is no

equitable obligation attaching in this case to the appellant, in respect to the insurance taken for its own benefit, or equitable lien upon the funds arising therefrom, in favor of the complainant. This conclusion would dispose of the case, as complainant's whole contention for the equitable relief sought rests upon the postulate of an express contract of the mortgagor to insure for the benefit of the mortgagee. Insurance Co. v. Lawrence, 10 Pet. 507, 9 L. Ed. 512; 1 Jones, Mortg. § 748.

But we do not wish to rest our determination of this case upon the mere ground of the construction of the language of the mortgage. We will, as to what we now have to say, assume that the complainant below is right in its contention that the mortgage does contain an express covenant on the part of the mortgagor to insure the mortgaged premises, when thereto demanded by the mortgagee. This brings us to the consideration of the second of the questions above stated, viz. whether the Penn Plate-Glass Company, by merely becoming the grantee of the equity of redemption, subject to the mortgage, thereby came under an obligation to insure for the benefit of the mortgagee and trustee, or such an obligation to indemnify the mortgagor against its obligation to insure, if such liability existed, as would be available to the mortgagee as complainant in this suit.

As to the first branch of this question, it is to be observed that "while," to quote the language of the supreme court in Wheeler v. Insurance Co., 101 U. S. 439, 442, 25 L. Ed. 1057, "it is settled by many decisions in this country that if the mortgagor is bound by covenant, or otherwise, to insure the mortgaged premises for the better security of the mortgagee, the latter will have an equitable lien upon the money due on a policy taken out by the mortgagor, to the extent of the mortgagee's interest in the property destroyed," the equitable lien in such case arises from the unperformed contract between mortgagor and mortgagee. Equity regards as done that which ought to be done. And, therefore, if the mortgagor, having so covenanted, fails to make the policy of insurance payable to the mortgagee, or to assign the same, before or after loss, the fund arising therefrom is clearly within the operation of the fundamental maxim just quoted, because the mortgagor was bound to so fulfill his promise to the mortgagee as that funds arising from insurance effected by the mortgagor should belong to the mortgagee, at least to the extent of his (the mortgagee's) interest in the property insured. This promise or executory contract equity will enforce by impressing such funds with a lien in favor of the mortgagee, whether in the hands of the mortgagor, his heirs, executors, or administrators, the insurance company, or voluntary assignees of said funds, or purchasers or incumbrancers thereof with notice. Walker v. Brown, 165 U. S. 654, 664, 17 Sup. Ct. 453, 41 L. Ed. 865; 3 Pom. Eq. Jur. § 1235. But, apart from cases of fraud, it is only when there is such a contract or promise, which can be so enforced, that courts of equity will recognize for that purpose the existence of an equitable lien. In such case the lien is impressed upon funds or property which, belonging to the promisor, were the very funds or property

which constituted the subject-matter of the contract, or to which the contract or promise related. It is essential, therefore, that the funds or other property which are to be charged with the lien should have, either at the time of the contract or afterwards, and while it was still unperformed, belonged to the party against whom the contract is to be so enforced, and be so identified, even though at the time of suit the said funds or property have come into the hands of volunteers, or of others who may be affected with notice. There must, therefore, exist a contract by the party owning, either in præsenti or in expectancy, the property sought to be charged, which directly or by necessary implication expresses the intention to charge such property with the lien, in favor of the other party to the contract. These requisites to the establishment of an equitable lien are clearly recognized by the supreme court in the late case of Walker v. Brown, 165 U. S. 654, 664, 17 Sup. Ct. 453, 41 L. Ed. 865. The court in that case quote and adopt the language of the supreme judicial court of Massachusetts in Pinch v. Anthony, 8 Allen, 536, as follows:

"It is well settled that a party may, by express agreement, create a charge or claim in the nature of a lien on real as well as on personal property, of which he is the owner or in possession, and that equity will establish and enforce such charge or claim, not only against the party who stipulated to give it, but also against third persons, who are either volunteers, or who take the estate on which the lien is agreed to be given with notice of the stipulation."

The supreme court go on to say:

"The subject was very fully reviewed, with reference to the English and American authorities, in Ketchum v. City of St. Louis, 101 U. S. 306, 25 L. Ed. 999, where the language just cited was approved; and that ruling was considered and reaffirmed, during this term, in Bank v. Yardley, 165 U. S. 634, 17 Sup. Ct. 439, 41 L. Ed. 855. Pomeroy, in his work on Equity Jurisprudence (vol. 3, par. 1235), condenses and states the general result of the authorities on the subject as follows: 'The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands, not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or incumbrancers with notice. * * * The ultimate grounds and motives of this doctrine are explained in the preceding section, but the doctrine itself is clearly an application of the maxim, "Equity regards as done that which ought to be done." ' "

We have dwelt upon these requisites to the establishment of an equitable lien, so that the lien of the mortgagee upon the money due upon a policy taken out by the mortgagor, where the mortgagor is bound by covenant or otherwise to insure the mortgaged premises for the benefit of the mortgagee, may be distinguished from the lien claimed by the complainant in the present case. No such lien as has been just described exists, or could exist, in favor of the mortgagee, the complainant in this case, as against Kann or the appellant, on the insurance funds belonging to them, or either of them. It is not pretended that there was any contract between Kann or the appellant company and the complainant to insure for its benefit, or any promise or declaration of intention, upon any or no consid-

eration, that they, or either of them, would so insure, or that policies or fund arising therefrom should be assigned or charged with a lien in its favor. The first essential requisite to an equitable lien, as above described, is, therefore, entirely wanting. There is no contractual relation of any kind between the mortgagee and the appellant, in whose name and for whose sole benefit these policies of insurance were taken out. If such a lien, therefore, exists on these insurance funds, in favor of the complainant, it must be on other grounds than these ordinary and well-understood ones. This is not the case of a mortgagee claiming an insurance taken out by the mortgagor, who had covenanted to insure for the benefit of the mortgagee; nor is it the case of such mortgagee claiming such insurance funds, when they had come into the hands of third persons, "who are either volunteers, or who take the estate [the insurance funds] on which the lien is agreed to be given with notice of the stipulation." The complainant does not claim that the funds due on policies taken out by the mortgagor, and which the mortgagor is held to have promised that he would assign to the mortgagee, have come into the possession of the appellant, with notice, and are therefore charged with a lien in favor of the mortgagee. Its claim is that the grantee of the equity of redemption, having taken the property expressly subject to the mortgage, which contained a covenant on the part of the mortgagor to insure on that ground alone, came either under a direct obligation to insure the premises for the benefit of the mortgagee, or under an obligation to indemnify the mortgagor for his liability under said covenant. But the property or "estate" which came to the hands of the appellant, as grantee of the equity of redemption, was the mortgaged premises, subject to the mortgage. There is no difficulty in determining what that estate is to be charged with. The court here, however, is asked to impress a lien in favor of the mortgagee, not on this estate, but upon funds which were never in any sense the property of the mortgagor, and could never have been the subject-matter of a promise on its part. It is the first branch of the claim above stated (i e. the alleged direct obligation) that we are now considering. The complainant suggests, but it is not seriously argued, that the mere taking of the equity of redemption, subject to the mortgage, put the grantee thereof in the shoes of the mortgagor, and made him "liable upon any covenants upon which the mortgagor is liable." It practically abandons this proposition, however, by everywhere. throughout its elaborate brief, and under each of the three or four heads of the argument, appealing to alleged special circumstances as supplying the equitable grounds for the relief it seeks. The argument of complainant's brief on this point, is, in substance, this: That the mortgage provided that, in case of default for six months or more in any of the covenants or stipulations of the mortgagor, the mortgagee shall have the right to enter and hold possession of the mortgaged premises or to foreclose the mortgage; that the mortgagee in this foreclosure suit has in some way asserted that right, by asking for a receiver, which the court denied (though the bill alleges only the default in payment of interest, as the basis of the suit); and that, to use the language of

complainant's brief, its claim "rests on the right of a trustee to enforce the lien of the mortgage for such a breach of the covenant [by entering and holding possession], and our [its] contention is that, under the circumstances outlined above, the property having been destroyed, the lien of the mortgage is capable of enforcement, and must be impressed on the insurance fund substituted for the lost property." Whatever the force of this argument may be, it at all events distinctly abandons the proposition above referred to, and impliedly admits that no direct liability on the covenant of the mortgagor to insure rested upon these defendants, or either of them, as a consequence of the mere taking of the equity of redemption, subject to the mortgage, but that, "under the circumstances outlined," the lien of the mortgage "must be impressed on the insurance fund substituted for the lost property." But why must the lien be so impressed? We have already adverted to the absence of any contract on the part of the defendant, express or implied, or expression of intention by these defendants, or either of them, to which the doctrine of equitable liens would apply. These funds sought to be charged were not funds of the mortgagor, on whom the obligation of the alleged covenant rested, and which, coming into the hands of defendants, with notice, are therefore within the scope and meaning of this doctrine, but they are the funds which have resulted from contracts of insurance made by these defendants with insurance companies in their own right, and for the protection of their own interests. The contracts were such as the defendant had a right to make, and the "circumstances" under which the contracts were made, so far from implying any intention on the part of these defendants, or either of them, to make the contract for, or appropriate the funds arising therefrom to, the benefit of complainant, expressly negative such intention in the most positive and explicit terms. In the first place, it appears from the language of the policies themselves that they were taken out for the sole benefit of the defendants, and they expressly stated that they did not cover at all the interest of the mortgagee; and, in the second place, it appears by the testimony, and it is not denied,—in fact, it is so stated by the complainant,— that both the defendants, during the periods of their successive ownerships, on being applied to by the mortgagee to take out insurance in behalf of and for the benefit of the trustee and mortgagee, declined, and continued to decline, so often as the request was repeated, coupling their refusal with the statement that no duty or obligation rested upon them so to do. And we find no other circumstances disclosed by the testimony in the record that would serve to create a lien on these insurance funds in favor of the complainant, in the absence of any contract or undertaking on the part of the defendants to so appropriate them. It is hard, under these circumstances, to see why these particular funds were any more subject to a lien in favor of complainant than funds of the defendant on deposit with its banker, or moneys coming to it from any other source. Equity will, under some circumstances, enforce the performance of a contract, or of a duty growing out of a contract, through the indirect methods of the recognition of an equitable lien or assignment;

but it will not, in the absence of fraud, create the duty or obligation independently of a contract, expressed intent, or will, at some time entered into or declared by the party sought to be charged.

So, far, then, we must conclude that the implied contract arising from the words "subject to the mortgage" is simply and solely a contract between the grantor and grantee of the equity of redemption, and can have no greater or other effect, at the most, than an express contract on the part of the grantee with the grantor to pay the mortgage debt, and that this contract must be measured by its own terms; that such an express contract to pay the mortgage debt draws with it no obligation to perform any of the covenants of the mortgage, except those which run with the land, and those would be binding on the purchaser irrespective of any contract to pay the debt. As it is conceded that the alleged contract to insure in this case does not run with the land, an obligation to pay the mortgage debt on the part of the grantee of the equity of redemption, if any such exist, of itself imposes no obligation to insure. This being so, it would seem to deprive of all force the argument of complainant last adverted to, viz. that, inasmuch as the mortgage provides that, in case of default in the performance of any of the covenants of said mortgage, the same shall, at the election of the mortgagee, become due and payable, and that, foreclosure proceedings having been instituted (whether distinctly for this special default or not), there was a right in the complainant trustee to enforce, by entry and holding possession, the lien of the mortgage for such a breach of this covenant, and that such lien is thereby impressed on this insurance fund, payable by the terms of the policies to the appellant company in its own right. But if it be true, as we have stated it to be above, that the implied contract of the appellant, as grantee of the equity of redemption, with the mortgagor and grantor, to pay the mortgage debt, if such implied contract existed, does not draw with it an obligation to perform the covenants of the mortgage, the nexus between such default and the funds resulting from insurance taken out by defendant company in its own right and for its own benefit fails to be established. The apparently hard situation of the complainant in this case might incline a court to desire, but cannot clothe it with the power to grant the relief sought.

Nor is the claim for a lien upon these funds helped by being rested upon the theory suggested by the second branch of the proposition we have been discussing; that is, that the defendants, or one of them, came under such an obligation to indemnify the mortgagor for his liability under the alleged contract to insure as would be available to complainant in this suit. The view we have taken as to the covenant to insure, where the grantee of the equity of redemption takes subject to the mortgage containing such covenant, would seem to apply, also, to this contention of the complainant; but, as the complainant rests mainly upon this proposition, we must consider it more closely. Two questions present themselves under it: First, was there an obligation resting on the appellant company to indemnify the mortgagor for his liability under the alleged contract to insure, by reason of the conveyance to it of the mortgaged prem-

ises, expressly subject to the mortgage; and, second, if there was such an obligation on appellant company, can it be made available to complainant in this suit? We have already said that this alleged covenant or contract to insure was not one which ran with the land, as it lacks the essential characteristics of such a covenant. It is entirely personal in its character, and does not bind the grantee of the equity of redemption, unless it does so by force of a contract, express or implied, between the parties to the conveyance. Insurance Co. v. Lawrence, 10 Pet. 507, 9 L. Ed. 512; Vernon v. Smith, 5 Barn. & Ald. 1. As we understand complainant in its brief and argument to practically admit that this is so, further discussion on this point is unnecessary. The reasoning that would exclude the implication of a direct obligation on the part of the defendant company to insure for the benefit of the mortgagee, by reason of its having become the grantee of the equity of redemption, subject to the mortgage, would seem, also, to exclude the implication of an obligation to indemnify the mortgagor on his covenant to insure. The taking expressly "subject to a mortgage for $250,000" may well be equivalent, as we have before stated, to an express contract to be responsible to the mortgagor for the mortgage debt, as part of the purchase money, but there is no implication in such a taking that the grantee is to be liable on the personal covenant of the mortgagor to insure. It is not within the terms of the contract, and it would be doing violence to the situation to impose such a liability without some evidence of assent on the part of such grantee. The only way in which the grantee of the equity of redemption becomes liable to the mortgagor and vendor, even to pay the mortgage debt, is by virtue of the contract, expressed in the direct assumption of the mortgage as part of the purchase money; and, in the absence of such an assumption, it would be creating a contract for such grantee, to hold him responsible for any covenants or obligations which the mortgagor has seen fit to enter into with the mortgagee. We are here dealing with contract, not with status; and no claim can be enforced against the appellant company, either directly or indirectly, by the impressment of lien on its money or property, unless such claim rests upon an actual contractual relation, or upon such conduct of appellant as amounts to fraud and estops it from denying such claim.

The case of Miller v. Aldrich, 31 Mich. 410, referred to by the learned judge below, and the only authority cited for the proposition that the covenant to insure for the benefit of the mortgagee is incidental and supplemental to the mortgage debt, and binding on the purchaser of the equity of redemption, presented facts which clearly involved fraud on the part of the purchaser. As stated by Judge Cooley, who delivered the opinion of the court, the facts were these: The owner and mortgagor (Chapman) had made an express contract with the mortgagee (Miller) to insure for his (Miller's) benefit, and, in pursuance thereof, took out a policy of insurance for the benefit of and payable to the mortgagee. Chapman afterwards sold the property, subject to the mortgage, to one Aldrich, who, with knowledge of the contract to insure, agreed to maintain the existing policy of insurance

for the benefit of the mortgagee. "Instead, however, of having the insurance policy assigned to Aldrich, it was surrendered, and a new one taken out in the name of Aldrich, and without providing in terms for the protection of Miller. This insurance was for eight hundred dollars, which was quite as much as the value of the building would justify. Miller, when he was informed what had been done, called upon Aldrich and expressed apprehension about his security, but Aldrich quieted him by assuring him that in the event of loss he should be protected by the insurance money. The building was actually destroyed by fire in the December following, and the loss has been adjusted and is ready to be paid over, but Aldrich now refuses to apply any portion of the money to the protection of Miller. The purpose of this suit is to compel the application, and the circuit court has decreed that the insurance moneys, to the amount of the Paine note, shall be paid into court, to be paid over to Miller on his discharging his mortgage." The facts here disclosed would clearly estop Aldrich, the purchaser of the equity of redemption, by reason of his fraud, from denying that the insurance money belonged to the mortgagee.

There is still another ground upon which exemption from this liability to insure for the benefit of the mortgagee could be claimed by the defendants in this case; .that is, that under the fourth article of the mortgage the mortgagor is exempted from all personal liability for the mortgage debt, and as, under the Pennsylvania law, as declared by its supreme court, the liability of a purchaser of mortgaged premises, under and subject to the mortgage, was one of indemnity to his grantor in respect to such mortgage debt, it follows that no such liability could exist in the present case. As the liability to indemnify the mortgagor on his covenant to insure is incidental and subordinate to his liability for the mortgage debt, no such liability to indemnify rests upon the appellant company and grantee in this case. This view would, of course, destroy the basis for any derivative claim on the part of this complainant with respect to such liability.

We come now to consider the complainant's last claim, which is that the special circumstances and facts of this case, as disclosed in the record, are such as would make it inequitable for the defendants to deny the relief sought, and that therefore the court should impress a lien in its favor upon the funds which, as it claims, are now in court, and subject to the court's disposition. As we have already intimated, such facts and circumstances must amount to fraud on the part of the appellant company, and serve, in the absence of any express contractual relation, to estop it from denying that these funds, the product of its own insurance, should be applied for the benefit of the complainant. We have carefully read and considered the record in this respect, and fail to find a state of facts showing fraud, or that would constitute an estoppel. It is true that Kann, one of the defendants, and the predecessor of the appellant company in title, became a stockholder and officer in the original company: that he found it in bad financial condition; that he loaned it money; and that finally, for his own protection, and that of others in interest,

he was active in promoting the suit in the Pennsylvania state court which resulted in the receivership and sale of the mortgaged property. We can discover nothing in the conduct of Kann, up to this point, to justify the charge of fraudulent conduct on his part, or that his conduct was otherwise than that of a practical business man, intent upon honestly securing the stake he had made in the company's affairs, or that he otherwise than honestly and prudently managed its affairs, so far as he had the management of them; nor do we find that the imputation that he deliberately wrecked the company, that he might become a purchaser of its property at a nominal price, is justified by the testimony. He became the purchaser at an open sale made by order of the court, and afterwards confirmed by it, and expressly subject to the mortgage of $250,000. He held it for a year, and then conveyed it to the Penn Plate-Glass Company, one of the defendants in the present suit. Whether he organized the latter company for the purpose of taking the title and carrying on the business, or not, is immaterial. If he did, he did only what he had a right to do; and the company so organized and taking the property by lawful conveyance, subject to the said $250,000 mortgage, stands before the court as a bona fide purchaser for value. Kann undoubtedly knew, and the appellant company also had notice, not only of the mortgage, subject to which he and it expressly took title, but of all the covenants and conditions contained in the same. Although not very material, the court below seems to have been mistaken in assuming that the policies of insurance taken out by the mortgagor or by the receiver were intentionally allowed to lapse by Kann, after his purchase, without the knowledge of the trustee, and that without such knowledge he afterwards took out policies in his own name on his own interest, and payable to himself, with the express exclusion of the bondholders from any interest in the same. The court was also mistaken in finding as a fact that this "insurance was placed by a party to this litigation under the stress of an application for the appointment of a receiver, and a consequent exclusion from possession," and also in finding that, pending the application for a receiver in the original foreclosure suit, the defendants signified their intention to place insurance upon the property for the benefit of the trustee, if they were bound to do so, but subsequently, and without knowledge of the trustee, took out the policies now in suit, payable to themselves, and expressly excluding the bondholders from any interest in the same, and in also finding that pending the appointment of a receiver "the purchasers agreed to and did place insurance." The facts in this regard, as disclosed by the record, are that, immediately after his purchase of the property at the receiver's sale, Kann, denying the request of the trustee and mortgagee that he should insure for its benefit, took out policies such as are here in question, and the same were renewed and maintained by the appellant company; that this was done openly, and with full notice to the trustee and complainant in this suit; that no duty was recognized by either of the defendants to insure for its benefit. As there was nothing in the conduct of Kann in his dealings with the mortgagor company or the complainant, up to the purchase by him at

the receiver's sale, to affect or qualify his rights as a bona fide purchaser, no more can we find in the record, since that time, anything that would amount to a fraud on this complainant, or serve to estop him or the appellant company from asserting his or its right to the funds arising from the policies taken out in its name and for its sole benefit, and in express repudiation of any duty or right of complainant company in regard to insurance. The complainant also lays much stress upon its allegation that the appellant company obstructed complainant in its efforts to take possession of the mortgaged property, and thereby prevented it from applying the rents and profits to insurance. But it appears that the only acts of obstruction the complainant is able to specify are the appearance of the appellant company in defense of the foreclosure suit; that in defending the same it resisted in open court, during the proceedings in this suit, the application for a receiver, and the delay in reaching a final decree, consequent upon the defense made by the appellant company and Kann, the other defendant identified with it. Upon careful examination, this allegation and the contention founded upon it seem frivolous. The defendants were brought into court by process, and exercised an unquestioned right in interposing, as they did, through respectable counsel learned in the law, the defenses which they were advised to make. Their course in this respect was not rebuked by the court. In fact, the court took their view as to the propriety of appointing a receiver pendente lite, and declined to grant the application of complainant therefor. And this, even though it was suggested that there was no insurance on the premises for the benefit of the mortgagee, and that defendants had declined to so insure, and refused to recognize a duty so to do. The court, in declining to appoint a receiver, said (to again quote its language), "I can't decide that question" (i. e. whether the defendant company was bound to insure for the benefit of the mortgagee and bondholders), "but that, if they were so bound, they ought to protect us" (the mortgagee and bondholders). It was at this juncture that the occurrence much dwelt upon by complainant took place. Kann and Wertheimer (large stockholders in appellant company) agreed to give, and did give, a stipulation in writing that out of the then existing policies, upon the interest of the appellant company, there should be set aside, in case of loss by fire, a sum sufficient to pay the valid bonds outstanding (not including those held by said Kann and Wertheimer), provided that it should be finally adjudicated that the said appellant company was bound, as grantee of the equity of redemption, by anything contained in said mortgage, or in the terms of its said purchase, to keep or maintain insurance for the benefit of the bondholders. The appellant company was not a party to this stipulation. Its only object and effect were to satisfy the court of the sincerity of the contention that the owner of the premises was under no obligation to insure for the benefit of the mortgagee, and that there was no disposition to evade such obligation, if it should be judicially determined that it existed. This is very far from justifying the contention of complainant that giving and filing this written agreement in some way served to put the court in control of the funds that might arise from

this insurance, in such fashion as to clothe it with a special jurisdiction to administer and apply the same. No duty of administering and disposing of a res in court was imposed by this stipulation, and no special equitable jurisdiction was raised thereby.

We are of opinion, therefore, that there is no direct liability between the appellant company and the mortgagee, because of the special circumstances disclosed in the record; and admitting, for the sake of argument, a liability of the defendant, as purchaser, to indemnify the mortgagor for its liability on the mortgage debt, and for its alleged obligation to insure, we find no special circumstances that would serve to transfer that liability into a liability to the complainant, in the shape of a lien impressed for its benefit upon the insurance funds. This view would dispose of the case, without considering the special theory and contention of the complainant that, having all the parties before the court, and the res (being the funds paid by the insurance companies) in court, the court, by recognizing a liability on the part of the defendant company to indemnify the mortgagor on his covenant to insure, instead of first compelling a proceeding against the mortgagor on said covenant, can, in order to avoid circuity of action, impress the funds in its hands with a lien in favor of the complainant. But this theory assumes the liability to indemnify on the covenant to have been established, and that by reason of some special circumstances in the case an equity has arisen in complainant to have that fund appropriated to its use. There is another criticism to be made upon this theory, in regard to the allegation that the res in the hands of the court gives a special remedial jurisdiction in the case. These funds which constitute the res are not in the hands of the court in any such sense as that a special jurisdiction to administer them attaches. They have only come into possession of the court, through its receiver, by reason of the claim that complainant has an equitable lien upon them, and there is a manifest impropriety under such circumstances in contending for a special jurisdiction for such relief on that account. What has been said renders it unnecessary to consider the effect of the act of assembly of the state of Pennsylvania of 1878. That act provides that grantees of real estate, subject to mortgage, shall not be personally liable for payment of such mortgage, unless they shall, by an agreement in writing, have expressly assumed a personal liability therefor, and providing that the use of the words "under and subject to the payment of such mortgage" shall not, alone, be construed to make such grantee personally liable, as aforesaid. We will observe, however, that, whatever may be the effect of this act upon the liability of grantee to grantor of real estate so incumbered, there can be no question that it was intended to destroy all derivative liability of grantee to mortgagee, unless such liability has been created by an express undertaking in writing. As we have before said, much of the difficulty in this case arises from the apparently hard situation in which the mortgagee and bondholders find themselves, and the not unnatural disposition to confound hard conditions with inequitable ones. In this respect, however, it should be remembered that both the owner of the equity of redemption and the mortgagee had

separate insurable interests, and that the mortgagee was fully noti-fied of the absence of insurance for its benefit, and of the refusal on the part of either of the defendants, as owners of the premises, to insure for its benefit, or to recognize a duty to do so. It could have insured the bondholders' interest after the foreclosure suit began, and charged the expenses of so doing to them. Insurance Co. v. Stinson, 103 U. S. 25, 26 L. Ed. 473; 1 Jones, Mortg. § 397. Instead of doing so, it chose to rely upon its peculiar view of the obligation of the defendants, and took the risk of justifying that view of the law, should it become necessary to do so.

For the reasons given, we are of opinion that so much of the decree of the circuit court as relates to the disposition of the insur-ance moneys collected by the receiver under order of the court must be reversed, and the court below directed to enter a decree that said moneys shall be paid to the said defendant the Penn Plate-Glass Com-pany, and that the said defendant have its costs under the said sup-plemental bill. It is so ordered.

ACHESON, Circuit Judge. I am not able to concur in the views expressed by the majority of the court, and I dissent from the de-cree of reversal. As a justification for this dissent, I might well con-tent myself with a reference to the exhaustive opinion of the court below. The importance of the case, however, both as respects the amount in controversy and the principles involved, seems to call for a specific statement of the reasons which influence me.

I differ from the majority of the court upon the fundamental ques-tion whether, under the terms of the trust deed or mortgage, there was an obligation upon the Penn Plate-Glass Company, the mortgagor, upon demand by the trustee, to insure for the benefit of the bondholders. I have no difficulty in finding such an obligation in the stipulation in relation to insurance contained in the tenth ar-ticle of that instrument:

"It shall be no part of the duty of the party of the second part to file or record this indenture; * * * nor shall it be any part of its duty to effect insurance against fire or other damage on any portion of the mortgaged prop-erty, or to renew any policies of insurance; * * * but the trustee may, in its discretion, do any or all of the matters or things in this paragraph set forth, or require the same to be done."

It is very clear to me that by this clause a right was conferred upon the trustee, in the interest and for the protection of the bond-holders, to require insurance against fire to be placed by the mort-gagor upon the mortgaged property. The parties to this indenture were the mortgagor, as party of the first part, and the trustee, as party of the second part. Now, a contractual right in one of two parties to an instrument to require a thing to be done implies a contractual obligation upon the other party to do the required thing. Here the right given to the trustee to require insurance involved a correlative duty on the part of the mortgagor to effect such insurance. As the judge below well said, unless the mortgagor "imposed the ful-filling of such requisition upon itself, it imposed it upon no one." Indeed, unless read as the court below read it, the clause relating

103 F.—11

to insurance is absolutely meaningless. Cogent reasons for imposing upon the mortgagor the obligation of effecting insurance for the security of the bondholders lie on the very surface of the case. As the preamble to the mortgage recites, the bonds were issued "to be used towards the payment of liabilities incurred in the erection of a plate-glass works" in course of erection upon the mortgaged premises, and the evidence shows that they were so used. It was the proceeds of these bonds that erected the works. Now, throughout this litigation it has been strenuously asserted by the Penn Plate-Glass Company, the appellant, that by virtue of article fourth of the mortgage the mortgagor was exempted from liability of a personal nature to pay either the principal or interest of the bonds, and that the remedy of the bondholders for payment was confined exclusively to the mortgaged premises. I understand the majority of the court to accede to this view. Manifestly, then, insurance was of the greatest importance to the bondholders. Indeed, it was a vital matter to them. Without insurance, they had no adequate security. For it appears from the testimony of W. L. Kann that the land upon which the works were erected was worth, "probably, $5,000 or $6,000," only. The locality was rural, and the land, consisting of 21 acres, according to his estimate was worth only about $300 an acre. This bonded mortgage debt, it will be remembered, was $250,000. It is a very significant fact that from the time the works were built down until Kann's purchase, in June, 1894, no one had questioned the right of the bondholders, under the terms of the mortgage, to protection by insurance taken out by the mortgagor for their benefit. Upon demand by the trustee, the mortgagor company effected and always maintained insurance for the benefit of the bondholders, usually to the full amount of the mortgage debt, and at no time less than $200,000, down to the appointment of the receiver by the state court, in March, 1894; and upon the like demand of the trustee the receiver, acting under the order of the state court, maintained such insurance for the benefit of the bondholders to the full amount of the mortgage debt, receiver's certificates having been issued under the order of the court for the purpose of effecting the insurance. That insurance was in full force when Kann purchased, it having then some months to run. This practical construction by the parties to the instrument of the provision touching insurance may not be conclusive here, but surely it should have great weight in fixing its meaning, if the language employed be deemed of doubtful import. I myself do not regard the language as at all uncertain. It seems to me unmistakably to impose upon the mortgagor company the obligation to insure for the security of the bondholders upon demand by the trustee.

Assuming the existence of a covenant or stipulation in the trust mortgage binding the mortgagor company to insure for the benefit of the bondholders, I pass to the question whether the appellant company came under the operation of this provision of the mortgage. Before adverting to the terms of the deed from the receiver to Kann, and the deed from the latter to the appellant, some collateral matters deserve notice. Kann was a stockholder in and a director of the original plate-glass company, the mortgagor, and treasurer thereof. At the

time of his purchase he had knowledge of the terms of the trust mortgage, and actual notice of the then existing insurance which the receiver, acting under the order of court, had effected for the benefit of the bondholders. Kann organized the new plate-glass company, the appellant, to operate the works on the mortgaged premises, conveyed the property to it, and became its president. The mortgage trustee at once duly notified first Kann, and then his new company, upon its organization, to insure for the security of the bondholders. The trustee likewise duly notified the mortgagor company to insure. That the old company was insolvent and in the hands of a receiver, and that the mortgage trustee was without funds, were facts known to Kann and his company, the appellant. The deed to Kann, in accordance with the terms of the' order of court under which it was made, distinctly set forth that the conveyance was made "subject" to the trust mortgage, and the deed from Kann to the appellant likewise set forth that the conveyance was made "subject" to the mortgage. The first article of the trust deed or mortgage provided thus:

"Until default shall be made by the party of the first part in the payment of the principal or interest of the said bonds thereby secured, or some of them, or in the performance of some one or more of the covenants, stipulations, or agreements herein required by it to be kept, performed, or done, the said party of the first part shall be suffered and permitted to possess, manage, operate, and enjoy the said hereinbefore mentioned and described plate-glass works and premises, with the appurtenances, and to take and use the incomes, rents, issues, and profits thereof, and to dispose of the same in any manner not inconsistent with these presents."

And the second article makes provision for entry by the trustee and eviction of the mortgagor company upon default by it, continued for six months after demand by the trustee. "in the performance of any covenant, agreement, or stipulation" contained in the mortgage, and thereby "required to be kept and performed" by the mortgagor.

Certainly the deed from the receiver conveyed to Kann no other or higher rights than those which were vested in the mortgagor company itself. Kann and his grantee, the new company, stood in the shoes of the mortgagor company in respect to title and right of possession. The above-quoted part of the first article of the trust mortgage, equally with the second article, bound the appellant company. Its possession of the property, and perception of the income, rents, issues, and profits, depended upon performance of the stipulation to insure for the benefit of the bondholders. It could not rightfully remain in the possession and enjoyment of the property without thus insuring, after the demand so to do made by the trustee. Therefore, having taken out insurance while thus in possession, and in the exclusive receipt of the income, rents, issues, and profits of the property, equity will conclusively presume that the insurance was taken out and held for the benefit of the bondholders. To effectuate justice, equity here will consider that as done which should have been done. Under the circumstances, the appellant company is not to be heard to say that the insurance was not for the security of the bondholders.

In my judgment, the case of these bondholders—their claim to an equitable lien upon the insurance fund which stands for the destroyed

property—does not at all depend upon the existence of a personal liability on the part of the mortgagor company to pay the mortgage debt. Nor does their case necessarily rest upon the theory of the assumption of that debt by the appellant company. The covenant or stipulation for insurance contained in the trust mortgage lies at the foundation of the equitable lien here asserted. If it be true that there is no personal liability for the debt on the part either of the mortgagor company or its successor in the title, the appellant company, if the mortgaged property itself was the only security the bondholders had, their equitable right to the substituted insurance fund is only the clearer. Now, the conveyance of the property to the appellant company, as we have seen, was made expressly subject to the trust mortgage, and the appellant company accepted the conveyance thus made, and under it took and maintained possession of the property. Then the trustee in due time and form required insurance to be effected for the benefit of the bondholders. The appellant company, with full knowledge of the facts, had voluntarily taken the place of the insolvent mortgagor company. Under the special circumstances, the appellant company should be regarded, I think, as having assumed the obligation to insure as stipulated in the mortgage.

But if a direct contractual liability to insure is not thus to be implied, as against the appellant company, in favor of the trustee, still I am of opinion that the court below rightly held that the appellant company, under the conveyance to it of the property subject to the mortgage, became bound to indemnify the mortgagor company against its liability upon the covenant or stipulation for insurance contained in the trust mortgage. Moore's Appeal, 88 Pa. St. 450; Blood v. Crew-Levick Co., 171 Pa. St. 326, 338, 33 Atl. 344. The Pennsylvania act of June 12, 1878 (P. L. 205), as these two cited cases show, has no application here. That act has no relation whatever to a covenant to insure. The purpose of the act was to relieve a vendee from an implied personal liability to pay the mortgage debt, arising from the "under and subject" clause. In Blood v. Crew-Levick Co., however, the supreme court of Pennsylvania distinctly held that the act of 1878 does not touch the covenant of a vendee to indemnify his vendor, implied from the "under and subject" clause. The obligation resting upon the appellant company to indemnify the mortgagor company against its covenant to insure is quite sufficient of itself to sustain the equitable jurisdiction exercised by the court below, and its decree in favor of the trustee. It is well settled that in a court of equity a mortgagee may avail himself of a contractual right of the mortgagor against the purchaser of the mortgaged property. Keller v. Ashford, 133 U. S. 610, 10 Sup. Ct. 494, 33 L. Ed. 667. Here the trust mortgage was the foundation of the suit. Pending the suit the mortgaged property in great part was destroyed by fire. Then the supplemental bill was filed. Thus circuity of action was prevented. The fund arising from the insurance is in the hands of the court. It stands in the place of the consumed property. The trustee's claim grows out of the trust mortgage, and is of an equitable nature. All the parties in interest were before the court. The equitable jurisdiction of the court with respect to the insurance fund, I think, is clear, without taking

into consideration at all the so-called "insurance bond" filed in the cause.

The original bill was filed on July 8, 1896, after six months' default both in respect to interest and the stipulation to insure. The Penn Plate-Glass Company, the appellant, interposed defenses which eventually proved to be entirely groundless. The trustee immediately upon the filing of the bill moved the court for the appointment of a receiver to take charge of the mortgaged property. This motion the Penn Plate-Glass Company resisted. In order to secure the denial of the motion, it procured and had filed in the cause a stipulation under seal, signed by W. L. Kann, the president of the company, and Emanuel Wertheimer, a large stockholder, covenanting that in the event of a loss by fire of the mortgaged property there should be paid ro the mortgage trustee, in trust for the holders of valid bonds, a sum equal to the amount of such bonds, "out of policies of insurance existing in favor of the Penn Plate-Glass Company: provided, that it shall have been finally adjudicated that the Penn Plate-Glass Company, the present owner of the said property, is bound or liable by anything contained in the said mortgage, or the terms of its purchase of the described mortgaged premises, to keep and maintain insurance for the benefit of the holders of bonds secured by the said mortgage." This stipulation was filed in court on July 24, 1896. The order denying the motion for the appointment of a receiver was not filed until September 7, 1896. It is true, it appears from the testimony that the judge had previously signified to counsel his intention to deny the motion; but thereupon, in open court (Kann, the president of the Penn Plate-Glass Company, and the counsel of the company being present), the counsel for the trustee called the attention of the court to the matter of insurance. The following is the testimony of the counsel as to what occurred:

"I said to the court that, in considering the motion for a receiver, it occurred to me that the court had not considered the fact that this property was without insurance; that there was danger of fire; that my client was a trustee without funds, and that that was a matter that ought to be considered; and that we were entitled to insurance. The other side denied that they were bound to insure under the terms of the mortgage. I insisted we should have insurance, they denying that we were entitled to insurance under the mortgage; and, under the circumstances, Judge Buffington said, 'I can't decide that question,' and intimated to them that, if they were bound to insure, they ought to protect us, and they denied they were bound to insure; and the paper signed by Mr. Kann and Mr. Wertheimer was given in pursuance of my demand for insurance, and filed in court, and is on file to-day."

This testimony is unimpeached. Certain it is that the court forbore final action upon the motion for a receiver until after the giving of this stipulation as to insurance. Now, it is true that the Penn Plate-Glass Company did not formally join in the execution of this paper, but it procured and had it filed in court. This is averred in the supplemental bill, and is not denied in the answer. Beyond contestation, this stipulation was given at the instance and in behalf of the Penn Plate-Glass Company, and for the purpose of preventing the appointment of a receiver, and it had that effect. In consequence of giving this stipulation that company was enabled to retain possession of the mortgaged premises against the trustee, without right, as the

subsequently taken proofs demonstrated. The fire of April 12, 1898, occurred while the trustee was thus wrongfully kept out of possession by the appellant company.

In the course of his opinion the judge below said:

"This insurance was placed by a party to this litigation under stress of an application for the appointment of a receiver, and a consequent exclusion from possession."

It is said that the judge fell into mistake as to the time the insurance was placed. I am not convinced of this. The policies were before him. We have been furnished with their dates. It is, however, certain that the observation of the judge just quoted is applicable in all its force to the so-called "insurance bond." That stipulation in respect to the insurance was given "under stress of an application for the appointment of a receiver," and to prevent the appellant company's expulsion from possession. But the time when the policies were taken out—whether before or after the application for the appointment of a receiver—is not a controlling matter. If, indeed, they were taken out before that application, this makes it rather the worse for the appellant company. For then it follows that the fact was suppressed that each policy contained this clause, namely:

"This property is subject to a bonded indebtedness of $250,000, but it is distinctly understood and agreed that this insurance does not cover the interest of the bondholders."

The presence of that clause was not known to the court or to the mortgage trustee until after the loss by the fire. In respect to the insertion of this clause the judge below, in his opinion, speaks thus:

"It was an act inter alios acta. The trustee and the court had no knowledge of it. It was not done in pursuance of any agreement, and can in no way affect the legal and equitable status and rights of the parties before the court."

This, I think, is a sound conclusion.

The insurance companies did not see fit to raise any question as to the measure of their liability. They have settled in full. The insurance, as taken, was not, in form or in effect, upon the equity of redemption. It was not upon the interest of the Penn Plate-Glass Company in the property, as intimated in the opinion of the majority of this court. The insurance was upon the glass works, namely, the buildings, machinery, apparatus, and other fixed improvements. The corpus of the property was the subject-matter of the insurance. The insurance companies have paid to the court's receiver the total value of the destroyed property. The appellant company claims, not the value of its equity in the lost property, but the entire insurance fund, —the total value of the destroyed property. The court below decided against the claim, as inequitable. I hold to the same view.

How unconscionable the position of the appellant company is becomes the more manifest when regard is had to the value of the improvements which Kann and his vendee company, the appellant, put on the mortgaged property. The highest figures for all their expenditures, as given by Kann himself, are "about" $185,000 to $200,000. Now, if the larger of these amounts is correct, the reversing decree

here will result in a great money speculation for the appellant company at the expense of the innocent bondholders. But in fact Kann's testimony, when scrutinized, discloses that the bulk of the alleged expenditures was in the purchase of additional ground (outside the mortgaged premises), and in the erection thereon of a water and a gas plant. It will be remembered that the price Kann paid to the receiver for the property was $37,000 only, and the alleged price paid by the appellant company to Kann for the property was only $83,-500.

In concluding, I cannot do better than refer to the case of Miller v. Aldrich, 31 Mich. 408, 410, 419, cited by the court below. I premise that there the agreement by Chapman, the mortgagor, to insure for the benefit of the mortgagee was not even contained in the mortgage, but was collateral and oral; and whether Aldrich, the purchaser, had verbally promised, as alleged, to keep up insurance for the benefit of Miller, the mortgagee, was denied. Judge Cooley, in the course of his opinion, said:

"Though Chapman may have had a legal right to surrender the policy he had taken out for Miller's protection, he had no equitable right to do so; and as Aldrich knew all the facts, and took his new policy on a wrongful surrender of one which protected Miller, and for a sum which precluded Miller from insuring on his own behalf, we think Miller must be held to have an equitable interest in the new policy to the extent of his lien, whether Aldrich did or did not expressly agree with Chapman that such should be the case, as the latter says he did. The case is within the principle of Cromwell v. Insurance Co., 44 N. Y. 42, and it is not important whether Chapman had or had not legally bound himself to Miller to keep up insurance for his benefit, when by virtue of the oral understanding he had actually effected such insurance."

Chief Justice Graves, who delivered the principal opinion, said:

"Chapman had bound himself to afford Miller security supplementary to and connected with the mortgage. The mode agreed on had reference to the mortgaged buildings, and was to be of a nature to keep the mortgaged property itself so far intact as a means of security as to perpetuate the safety of the mortgagee's interest in case the buildings should burn. This stipulation was in equity a sort of adjunct to the mortgage, and was binding on Chapman and on all others in his shoes with notice. When he sold to Aldrich he does not appear to have kept any insurable interest, or to have been in a situation to personally effect insurance to any amount; and Aldrich appears to have taken his place, and to have occupied a situation which required him to recognize and respect the term of the agreement intended to fortify Miller's security under the mortgage. Instead, however, of recognizing and respecting it, he joined in the transaction to set it aside, and to so place himself that, if the mortgaged property should burn, he might put the mortgage money, of which he had already received the benefit, in his own pocket, and leave Miller a remediless loser to that amount. As before intimated, I think equity will not sanction this, but will consider that the agreement between Chapman and Miller in regard to insurance was enforceable by the latter against the former, and that Aldrich's position exposes him to a similar remedy in favor of Miller."

The facts here, I think, make a far stronger case in favor of the mortgagee than did the facts in Miller v. Aldrich. The principles there laid down commend themselves to my judgment. If applied here, as I think they should be, they would lead to an affirmance of the decree of the court below